*In re* ROGER B.—(ROGER B., Petitioner-Appellant, *v.* THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee.)

First District (3rd Division)    No. 79-763

Opinion filed June 25, 1980.

RIZZI, J., dissenting.

Patrick T. Murphy, of Goldberg & Murphy, Ltd., of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., John A. Dienner, III, and Randye A. Kogan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Roger B., appeals from an order of the circuit court of Cook County dismissing his amended petition to open sealed birth and adoption records. He raises several constitutional questions concerning the validity of the Illinois statute which places adoption records and original birth documents under seal. (Ill. Rev. Stat. 1977, ch. 40, par. 1522.) The pertinent facts are as follows.

Four adoptees filed petitions to review their sealed birth records. The trial court ruled that under the Illinois statute an adoptee could view original birth and adoption records only upon a showing of good cause. Petitioner filed an amended petition alleging that adulthood was of itself good cause and that the Illinois statutory scheme sealing adoption and original birth records from adult adoptees was unconstitutional. Neither side disputes the trial court's finding that good cause is required to release adoption and birth records to an adoptee.

At the hearing, petitioner testified that he has been searching for his biological family and was aware that his natural mother had inquired about him approximately one year after his adoption. He did not believe that he would be rejected by his natural parents, and he would leave them alone if they did not wish to see him. Petitioner regarded himself as emotionally stable and financially comfortable. His search was premised simply upon his desire to seek people related to him by blood.

Petitioner's adoptive mother testified that she generally supported the petitioner and his search efforts. Petitioner's sister, also an adoptee, testified that her search for her biological family had been successful. She currently enjoyed relationships with both her natural and adopted families.

At the conclusion of the hearing, the trial court ruled that petitioner's adult status was insufficient to demonstrate good cause. Accordingly, the court denied petitioner's request.

On appeal, petitioner contends that the Illinois statute violates his right to receive important information and his right to privacy; that his due process rights were violated; that he was denied equal protection of

the laws; that the statute is violative of the ninth amendment; and that the trial court erred in not determining adulthood was of itself good cause to view original birth and adoption records.

Petitioner initially contends that the Illinois adoption statute violates his right to receive important information. While the Constitution protects the right to receive information and ideas (*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817; *Kleindienst v. Mandel* (1972), 408 U.S. 753, 33 L. Ed. 2d 683, 92 S. Ct. 2576), the first amendment does not guarantee a constitutional right of special access to information not available to the public generally (*Branzburg v. Hayes* (1972), 408 U.S. 665, 33 L. Ed. 2d 626, 92 S. Ct. 2646; *Zemel v. Rusk* (1965), 381 U.S. 1, 14 L. Ed. 2d 179, 85 S. Ct. 1271). The right to receive information presupposes a willing speaker. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*

■■ The right to receive information does not require the unwilling disclosure of nonpublic records simply because the adoptee desires its release. Nor can we consider the adoptee's right to receive information absolute to the exclusion of the rights of others affected by disclosure. (*Alma Society, Inc. v. Mellon* (S.D.N.Y. 1978), 459 F. Supp. 912; *Mills v. Atlantic City Department of Vital Statistics* (1977), 148 N.J. Super. 302, 372 A.2d 646.) The information sought by petitioner is a product of the judicial process. (*In re Maples* (Mo. 1978), 563 S.W.2d 760.) The confidentiality of adoption records serves several purposes. By providing a statutory assurance of anonymity to the adoptee's natural parents, confidentiality encourages the surrender of children for adoption and serves to protect the natural parents from public disclosure of a traumatic emotional event and the possible intrusion into their private life by the reappearance of a child given up years before. (*In re Adoption of Female Infant* (1979), 5 Fam. L. Rep. 2311; *In re Maples.*) It also serves to protect the adoptive parent from interference by the natural parents in raising the child and facilitates the formation of an integrated family unit. (*In re Christine* (R.I. 1979), 397 A.2d 511; *In re Adoption of Spinks* (1977), 32 N.C. App. 422, 232 S.E.2d 479.) The confidential nature of the adoption also functions to protect the adoptee from any stigma of illegitimacy and conflicts between natural and adoptive parents. (*Mills v. Atlantic City Department; In re Adoption of Female Infant*; see also Ill. Rev. Stat. 1977, ch. 40, par. 1522.) The public interest in confidentiality is to preserve the integrity of the adoptive process and to provide the adoptive family with the same autonomous environment traditionally afforded other families. (*Alma Society, Inc. v. Mellon; In re Christine.*) The statutory provision for sealed birth and adoption records is an obvious legislative attempt to consider the interests of all parties to the adoption proceeding.

As such, we do not believe that the petitioner's right to receive information outweighs the different interests of the other parties involved. Moreover, the petitioner's right to receive information regarding his biological origins is not totally denied. Rather, it is conditioned only upon a showing of good cause. This conditional limitation on the disclosure of adoption records is not unreasonable and is necessary to meaningfully balance the varying interests of the parties. We find that petitioner's right to receive information has not been unconstitutionally abridged.

Petitioner next contends that the Illinois statute violates his right to privacy. He asserts that the information regarding his ancestry is a family matter and should be free from government intrusion and restrictions.

Although the United States Constitution does not expressly mention right of privacy, the United States Supreme Court has recognized that a constitutional right to privacy exists. (*Carey v. Population Services International* (1977), 431 U.S. 678, 52 L. Ed. 2d 675, 97 S. Ct. 2010; *Griswold v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678.) Several matters concerning the family have been constitutionally protected from unwarranted governmental intrusion, such as marriage (*Loving v. Virginia* (1967), 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817), procreation (*Skinner v. Oklahoma* (1942), 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110), contraception (*Eisenstadt v. Baird* (1972), 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029), abortion (*Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705), child rearing (*Wisconsin v. Yoder* (1972), 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526), and family relationships (*Prince v. Massachusetts* (1944), 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 435). Nevertheless, the constitutional guarantee of privacy protects only those personal rights which are fundamental or implicit in the concept of ordered liberty. (*Roe v. Wade; Palko v. Connecticut* (1937), 302 U.S. 319, 82 L. Ed. 288, 58 S. Ct. 149; *Smith v. Shimp* (1977), 562 F.2d 423.) In the present case, petitioner has presented substantial evidence of the psychological and social significance of hereditary information to the adoptee. Yet, the relative social or individual importance of the requested information is not determinative. Petitioner's interest in the biological information can be regarded as fundamental only if his asserted right to the information is explicitly or implicitly guaranteed by the Constitution. (*San Antonio Independent School District v. Rodriguez* (1973), 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278.) Petitioner's interest in the requested information, while socially and psychologically important, cannot be considered fundamental by definition. Having determined that petitioner's interest is not fundamental in the constitutional sense, and that the Illinois statute providing for sealed birth and adoption records serves many important interests in the adoption process, we find that the statute does not violate petitioner's right to privacy.

Petitioner also contends that the Illinois statute violates due process. Freedom of personal choice in matters of family life is one of the liberties protected by the due process clause of the fourteenth amendment. (*Smith v. Organization of Foster Families* (1977), 431 U.S. 816, 53 L. Ed. 2d 14, 97 S. Ct. 2094.) Family interests, however, are not beyond regulation. (*Moore v. East Cleveland* (1977), 431 U.S. 494, 52 L. Ed. 2d 531, 97 S. Ct. 1932.) Due process is not an inflexible concept. (*In re Stephenson* (1977), 67 Ill. 2d 544, 369 N.E.2d 1273.) In determining whether the Illinois statute violates due process, the nature of petitioner's interest must be examined in conjunction with the importance of the other varying interests and the extent to which they are served by the challenged statute. *Moore v. East Cleveland; Board of Regents v. Roth* (1972), 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701.

In the present case, petitioner's desire to learn the identity of his natural parents is not based upon medical necessity, psychological trauma, religious or moral concerns. Likewise, his wish is not asserted for any significant social or economic reasons. Indeed, by his own testimony, petitioner has stated that his desire is simply one of curiosity. Petitioner's request for disclosure may have significant impact upon the adoption process and on the other persons involved. The statute providing for confidentiality was designed, among other goals, to protect the interests of all persons involved in the adoptive process. Release of sealed adoption records conditioned upon a showing of good cause does no more than protect these various interests. It places no undue burden upon the adoptee and does not arbitrarily impose upon or purposelessly restrain the adoptee's desire for gealogical information. Such regulation merely gives full recognition to an adoptive family unit already in existence and provides some protection for the natural parents and the adoptive process. We find no violation of due process.

Petitioner next contends that the Illinois statute violates his right to equal protection of the laws. He maintains that adoptees are discriminated against because only they must secure a court order to obtain birth records and that such a classification is inherently suspect. Suspect classes have been described as those which suffer from "an immutable characteristic determined solely by the accident of birth." (*Frontiero v. Richardson* (1973), 411 U.S. 677, 686, 36 L. Ed. 2d 583, 591, 93 S. Ct. 1764, 1770.) Traditional indications of suspect classes have been a history of purposeful unequal treatment and relegation to a position of political powerlessness. (*San Antonio Independent School District v. Rodriguez.*) Suspect classifications are subject to the strictest standard of judicial review. (*Graham v. Richardson* (1971), 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848.) On this basis, only race (*McLaughlin v. Florida* (1964), 379 U.S. 184, 13 L. Ed. 2d 222, 85 S. Ct. 283), alienage (*Graham v.*

*Richardson*), and national origin (*Oyama v. California* (1948), 332 U.S. 633, 92 L. Ed. 249, 68 S. Ct. 269), have been designated as suspect classifications. We do not believe that adoptees satisfy suspect criteria. It cannot be said that adoptees derive their status from any "accident of birth." The adoptee's status is derived from a legal proceeding. (*Mills v. Atlantic City Department.*) Adoptees have not been relegated to an inferior status; they are not politically disadvantaged or legislatively powerless.

Requirement of a court order to view original birth records does not subject adoptees to any invidious discrimination. Equal protection does not require that all persons be treated equally. (*McGowan v. Maryland* (1961), 366 U.S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101; *People v. Pembrock* (1976), 62 Ill. 2d 317, 342 N.E.2d 28.) The Illinois statute is fairly and substantially related to a legitimate State interest. It places only a reasonable limitation on access to sealed adoption records. We find no violation of equal protection.

We find no merit in petitioner's next contention that the Illinois statute violates his ninth amendment fundamental right to an identity. The question is not, as petitioner contends, whether an adult adoptee has the right to an identity, but rather is whether an adult adoptee has a constitutionally protected right to know one's ancestors. We perceive no such right. It cannot be said that this asserted right is of such a character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions. (*Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55.) Nor does the restricted access to adoption records offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Speiser and Randall* (1958), 357 U.S. 513, 2 L. Ed. 2d 1460, 78 S. Ct. 1332; *Leland v. Oregon* (1952), 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002.

■■ Petitioner finally contends that the trial court erred in determining that adulthood was not of itself good cause to have access to the adoption records. He maintains that an adult is responsible enough to cope with receipt of such information and that any determination of good cause must be resolved in furtherance of the adoptee's welfare. We do not believe that any finding of good cause can be so simply determined.

Good cause requires an analysis of many factors, which will necessarily vary depending upon the facts of each case. Some of the factors are the need for the genealogical information, the nature of the petitioner's request, the age and maturity of the adoptee, the proposed use of the information, and any countervailing considerations. In any event, a determination of good cause must reflect serious consideration of the interests of all persons involved.

In the present case, petitioner's request is not asserted for any special need. The trial court correctly determined that adulthood itself does not constitute good cause.

For the foregoing reasons, the judgment of the circuit court of Cook County dismissing the petition to open petitioner's sealed birth and adoption records is affirmed.

Judgment affirmed.

SIMON, J., concurs.

Mr. JUSTICE RIZZI, dissenting:

The petitioner is an adult adopted person who seeks to view his birth records. The records were sealed pursuant to a statutory scheme in effect at the time of his birth, and they remain sealed in accordance with the statutory provisions as they presently exist. (Ill. Rev. Stat. 1977, ch. 40, par. 1522; ch. 111½, pars. 73—17(2)(a), (4).) The majority upholds the constitutionality of the statutory provisions as to adults. I respectfully dissent. In my opinion, the statutory provisions are unconstitutional and void as to adults.

To me, an adult's decision as to whether he wishes to know the identity of his genetic parents is a private and personal decision which he has a fundamental right to make for himself. In this regard, the constitution guarantees that fundamental rights, even those not explicitly mentioned in the constitution, shall be guaranteed. *Griswold v. Connecticut* (1965), 381 U.S. 479, 482-85, 14 L. Ed. 2d 510, 513, 85 S. Ct. 1678.

The fact that we are dealing here with a fundamental right is illustrated by the questions we all have about ourselves. What are the physical characteristics to which my children may be genetically prone? What is my ancestral nationality or religious persuasion? What sufferings and endurances are in my roots? What achievements or feats can I point to with ancestral pride? Can anyone seriously deny that one's liberty to pursue these and similar questions is "so rooted" in the traditions and conscience of our people "as to be ranked as fundamental"? (See *Griswold*, 381 U.S. 479, 493, 14 L. Ed. 2d 510, 520, 85 S. Ct. 1678 (Goldberg, J., concurring, quoting *Snyder v. Massachusetts* (1934), 291 U.S. 97, 105, 78 L. Ed. 674, 678, 54 S. Ct. 330).) Thus, the right to know one's individually created identity must be considered a fundamental right. For those persons that are adopted, however, the only way that this fundamental right can be meaningful is to include within it one's liberty to know the identity of his genetic parents. In my opinion, this inclusion is

demanded within the quintessential meaning of the fundamental right to know one's individually created identity.

Moreover, a comparison of this right with rights that have been held to be fundamental supports the conclusion that this is a fundamental right. Examples of rights which have been held to be fundamental include a woman's right to terminate her pregnancy[1], matters regarding procreation[2], activities relating to marriage[3], matters involving contraception[4], matters of family relationships[5], and child rearing and education[6]. The common element which ties these protected rights together is that they involve a private choice about one's personal life to be made by each individual without governmental interference. An adult's right to decide whether he wants to know the identity of his genetic parents is a right that is part of the same strain and contains the same common element. In my opinion, it is likewise a fundamental right protected by the constitution.

Having concluded that this case involves a fundamental right protected by the constitution, there remains the inquiry as to whether the statutory provisions are justified by a compelling State interest and are narrowly drawn. (*Roe v. Wade* (1973), 410 U.S. 113, 155, 35 L. Ed. 2d 147, 178, 93 S. Ct. 705, 727.) In discussing the purpose of the statutory provisions, the majority opinion states that by "providing a statutory assurance of anonymity to the adoptee's natural parents, confidentiality encourages the surrender of children for adoption and serves to protect the natural parents from public disclosure of a traumatic emotional event and the possible intrusion into their private life by the reappearance of a child given up years before."

First, in my opinion, the claim that sealing the birth records of adopted adults "encourages the surrender of children for adoption" is untenable. In this regard, it is interesting to note that there has been no showing that sealing birth records of adult adopted persons encourages the surrender of children for adoption. As an example, the statutory provisions in this case were adopted in Illinois in 1961.[7] Using the largest county in Illinois as a reference, there were 3,345 adoptions in Cook

---

[1] *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705.

[2] *Skinner v. Oklahoma* (1942), 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110.

[3] *Loving v. Virginia* (1967), 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817.

[4] *Eisenstadt v. Baird* (1972), 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029.

[5] *Prince v. Massachusetts* (1944), 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438.

[6] *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571; *Meyer v. Nebraska* (1923), 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625.

[7] Prior to 1945, there were no statutory provisions in Illinois for sealing the birth records of adopted persons. Between 1945 and 1961, birth records were sealed to all but the adult adopted person. (Ill. Rev. Stat. 1959, ch. 111½, par. 48a1.) It was not until 1961 that the present statutory provisions, which preclude both minor and adult adopted persons from viewing their birth records, went into effect. Ill. Rev. Stat. 1961, ch. 4, par. 9.1—18; ch. 111½, par. 73—17(2)(a)(4).

County in 1960, when adopted adults were able to view their birth records. In 1978, after the statutory provisions had been in effect for 17 years, there were only 2,089 adoptions in Cook County. Administrative Office of the Illinois Courts, Annual Report to the Supreme Court (1960 and 1978).

Moreover, in order to be valid, the statutory provisions must be narrowly drawn to represent *only the legitimate State interests at stake.* (*Roe*, 410 U.S. 147, 155, 35 L. Ed. 2d 147, 178, 93 S. Ct. 705, 727; *Doe v. Bolton* (1973), 410 U.S. 179, 211, 35 L. Ed. 2d 201, 187, 93 S. Ct. 739, 757 (Douglas, J., concurring).) The legitimate interest which the State has in adoptions is the welfare of the child. The State cannot claim a legitimate interest in encouraging women to give up their children for adoption. I think a State would be on perilous ground if it actively encouraged women, for whatever reason, to divest themselves of their children so that the children may be adopted. Also, in view of the holding in *Roe v. Wade*, there is a serious constitutional question as to whether the State may effectively encourage adoptions prematurely, for then it may be involving itself too early in the private abortion vis-a-vis adoption decision of the pregnant woman.[8]

Next the majority opinion states that one of the purposes of the statutory provisions is "to protect the natural parents from public disclosure of a traumatic emotional event and the possible intrusion into their private life by the reappearance of a child given up years before." I agree that protecting the genetic parents from public disclousre of a traumatic emotional event may be a concern of the State, but I cannot agree that it is a compelling State interest. Laws are not generally enacted to protect persons from the consequences of their own acts on their private lives. As an example, we do not have laws which seal annulment or divorce records, although the surfacing or disclosure of an annulment or divorce years after the event may prove devastating to new-founded family relationships.[9] Indeed, the traumatic and emotional events of an annulment or divorce are often described in detail in published court opinions; yet, there does not seem to be a compelling State interest in sealing annulment or divorce records.

The majority opinion next states that the statute "serves to protect the adoptive parent from interference by the natural parents in raising the child and facilitates the formation of an integrated family unit." Of course, the parents of an adopted child should be protected from

---

[8] In *Roe*, 410 U.S. 113, 163-64, 35 L. Ed. 2d 147, 182, 93 S. Ct. 705, 732, the court held that the State may become involved in the abortion decision only after the first trimester.

[9] See, *e.g.*, *Wolfe v. Wolfe* (1979), 76 Ill. 2d 92, 389 N.E.2d 1143. In *Wolfe*, a marriage of over nine years was annulled as a result of the husband's discovery that his spouse had been previously married and divorced. The annulment was granted even though a child had been born during the marriage.

interference by the genetic parents in raising the child, and the child should be raised in an integrated family unit. But this proposition does not answer the question involved here. The petitioner and others similarly situated are no longer children; they are adults. Admittedly, the interests we are discussing are compelling while the adopted person is a child, but they cease to be compelling when he becomes an adult.

The majority opinion next states that the "confidential nature of the adoption also functions to protect the adoptee from any stigma of illegitimacy and conflicts between natural and adoptive parents." However, the argument apparently presupposes that all adopted children are illegitimate, which is obviously not true. This observation is relevant because an argument could be made that if an adopted person is permanently kept from being informed, he will naturally assume that he was illegitimate. Thus, the statutory provisions may actually *cause* people to maintain a "stigma of illegitimacy" rather than prevent the condition.

The majority opinion next states that the "public interest in confidentiality is to preserve the integrity of the adoptive process and to provide the adoptive family with the same autonomous environment traditionally afforded other families." However, the fact that several States and nations[10] allow adult adopted persons to view their birth records, without any apparent ill effect, demonstrates that preventing adult adopted persons from viewing their birth records is not a prerequisite for either preserving the integrity of the adoptive process or for providing the adoptive family with the same autonomous environment traditionally afforded other families. This position is also supported by the proposed Model State Adoption Act[11], which provides:

> "The original certificate remains sealed to the adoptee until he attains majority, at which time he may inspect the original record which contains the names of his birth parents." 45 Fed. Reg. 10639 (1980).

[10] Ala. Code Ann., tit. 26, §26—10—4 (Supp. 1979); Kan. Stat. Ann., §65—2423(a) (Supp. 1979); Fla. Stat. Ann., §63.162 (West Supp. 1980); England, The Adoption Act 1976, §51; Finnish Law, Pr. 30a, H10; Laws of State of Israel, Adoption of Children Law 5720—1960, par. 27; Adoption (Scotland) Act 1978, ch. 28, par. 45(5); Wales, the Adoption Act 1976, §51. The Adoption Act 1976 was enacted by the English Parliament after receiving recommendations from a committee specially formed to research, hear evidence and study adoption problems. The committee filed its recommendations in 1972 under a report entitled Report of the Departmental Committee on the Adoption of Children. (Cmnd. 5107.) The report states at page 85: "The weight of the evidence as a whole was in favour of freer access to background information, and this accords with our wish to encourage greater openness about adoption. We take the view that on reaching the age of majority an adopted person should not be denied access to his original birth records. We therefore recommend that all adopted adults in England and Wales, whenever adopted, should in future be permitted to obtain a copy of their original birth entry, and that in Scotland the age at which access to original birth records is permitted should similarly be 18, instead of 17 as at present."

[11] The proposed Model State Adoption Act was recently developed pursuant to title II of the United States Code. The Act, for the first time, assembles the different statutes relating

Accordingly, in my opinion, the "integrity of the adoptive process" and the "autonomous environment" arguments do not demonstrate compelling State interests for the statutory provisions involved here. Thus, the arguments are unavailing to deny the adult petitioner his fundamental right to view his birth record.

The majority opinion next states that the "statutory provision for sealed birth and adoption records is an obvious legislative attempt to consider the interests of all parties to the adoption proceeding." I disagree. Plainly, the statutory provisions disregard the interests of adopted adults.[12] Rather, the statutory scheme primarily attempts to protect the interests of the other parties that are involved. But regardless of one's feelings about the validity of this proposition, the important point is that the answer is not determinative of the critical issue involved here. We are concerned with whether there is a compelling State interest to deny certain adults a fundamental right and not whether there is a showing that the statutory scheme has some rational relationship to the effectuation of a proper State purpose. Attempting to balance the interests of the parties may be a proper State purpose, but that would not be sufficient to permit the abridgment of the petitioner's fundamental personal liberties. In *Griswold v. Connecticut,* it is stated:

> "In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. 'Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling,' *Bates v. Little Rock,* 316 U.S. 516, 524. The law must be shown 'necessary, and not merely rationally related, to the accomplishment of a permissible state policy.' *McLaughlin v. Florida,* 379 U.S. 184, 196. See *Schneider v. Irvington,* 308 U.S. 147, 161." (381 U.S. 479, 497, 14 L. Ed. 2d 510, 523, 85 S. Ct. 1678, 1688-89 (Goldberg, J., concurring.).)

---

to adoption into a unified code which may be enacted in whole or in part by the States. 45 Fed. Reg. 10624 (1980).

[12] It is interesting to note that the statutory provisions effectively deprive adopted adults of possible inheritances. This is readily apparent when one considers that adoption does not cut off one's right to inherit from his genetic parents or from the estates of his other genetic relatives. (*In re Estate of Cregar* (1975), 30 Ill. App. 3d 798, 800, 333 N.E.2d 540, 542.) How can adopted adults inherit from their genetic parents or genetic relatives if the law prohibits them from finding out their identity? The circumstances become virtually absurd when one considers 30-, 40- and 50-year-old adopted adults being denied their rightful inheritances because the law prevents them from knowing the persons from whom they are legally entitled to inherit. I accept the argument that there is a compelling State interest to effectively deprive them of their inheritances while they are minors, but I deny such a compelling State interest exists after they become adults.

Thus, even if the legislature had done a perfect job of balancing the interests of all parties in the adoption process, the statutory provisions would nevertheless be unconstitutional unless a compelling State interest is shown. In my opinion, no discernable compelling State interest has been shown.

In reaching my conclusion, I recognize that the State has an interest in protecting the welfare of children and in safeguarding them from matters which might prevent their growth into free and independent well-developed citizens. (See *Carey v. Population Services International* (1977), 431 U.S. 678, 706-07, 52 L. Ed. 2d 675, 698-99, 97 S. Ct. 2010, 2027 (Powell, J., dissenting).) But the petitioner and others similarly situated are no longer children; they are adults. The compelling State interest in protecting their welfare as children ceased when they became adults.[13]

Accordingly, as to adults, the statutory provisions are not justified by any compelling State interest. Therefore, they violate the adult petitioner's fundamental right to know the identity of his genetic parents. This fundamental right, like other fundamental rights not explicitly mentioned in the constitution, is a personal right "retained by the people" within the meaning of the ninth amendment.[14] Thus, it is a fundamental right which is protected by the fourteenth amendment from infringement by the States. (See *Griswold*, 381 U.S. 479, 499, 14 L. Ed. 2d 510, 524, 85 S. Ct. 1678, 1689-90 (Goldberg, J., concurring).) Consequently, I believe that the trial court erred in dismissing the amended petition to allow the adult petitioner to view his birth records. I would reverse the dismissal and remand the case for further proceedings consistent with what is stated herein.

---

[13] The fact that a compelling State interest can commence or cease after a period of time is no longer debatable. In *Roe v. Wade* (1973), 410 U.S. 113, 163-64, 35 L. Ed. 2d 147, 182-83, 93 S. Ct. 705, 731-32, the Court held that the State has a compelling State interest in regulating abortions *after* the first trimester, *but prior to that time*, the State may not interfere in the decision.

[14] See *Griswold* 381 U.S. 479, 482-85, 14 L. Ed. 2d 510, 511-15, 85 S. Ct. 1678, 1680-82 and *Doe v. Bolton* (1973), 410 U.S. 179, 209-13, 35 L. Ed. 2d 201, 185-88, 93 S. Ct. 739, 756-58 (Douglas, J., concurring), for a discussion of fundamental rights that have been included within the penumbra of the Bill of Rights.