JAMES " DOE ", Appellant, *v.* ISABEL " ROE " et al., Respondents. In the Matter of JAMES " DOE ", Appellant. RICHARD " ROE " et al., Respondents.

Second Department, November 22, 1971.

434

*Michael I. Winter* for appellant.

*Seymour Schwartz* for respondents.

MUNDER, J. These consolidated appeals raise an interesting question, namely, whether a putative father can oppose the adoption of his son, born out of wedlock, by relying on an agreement entered into with the boy's mother.

The agreement was executed by the putative father, "Doe" ("Doe" being fictitious), on October 31, 1966 and by the mother, who is now (Mrs.) Isabel "Roe" ("Roe" being fictitious), on November 4, 1966. It provides in pertinent part as follows:

"1. The Mother shall have custody and control of the Child, subject however, to the following terms and conditions: * * *

"(h) Notwithstanding the remarriage of the Mother, the Child shall continue to be known by the surname of * * * [DOE]. The Child is not, for any purpose or for any reason, to use or assume the name of any subsequent husband of the Mother should the Mother remarry or use any other name.

"(i) The partial relinquishment of the custody of the Child by the Father to the Mother, as in this paragraph privided [sic], shall not be construed to be a consent on the part of the Father to the adoption of the Child by any other person. * * *

"(1) The parties shall confer with each other on all important considerations pertaining to the health, welfare, education and upbringing of the Child, with a view to arriving at a harmonious policy.

"(m) The parties shall exert every reasonable effort to maintain free access and unhampered contact between the Child and each of the parties, and to foster a feeling of affection between the Child and the parties. Neither party shall do anything which may estrange the Child from the other party, or which may hamper the free and natural development of the Child's love and respect for the other party. * * *

"2. The Father shall make the following payments to the Mother for the Child's support and maintenance:

"(a) The Father agrees to pay monthly to the Mother the amount of One Hundred Dollars ($100.00).

" (b) The amount set forth in subdivision (a) of this paragraph shall be payable in advance on the first day of each month.

" (c) If at any time hereinafter [*sic*] the Mother remarries, all payments by the Father under this paragraph shall continue.

" (d) The Father shall make the payments set forth in this paragraph until the Child reaches the age of 21, unless prior to that time the Child commences full-time employment or marries, in which event support payments shall cease.

" (e) In addition to the foregoing, the Father shall pay to the Mother such amounts as will properly and adequately cover one-half (½) of the medical, dental and surgical expenditures of the Mother for the Child."

At the time this agreement was executed, the child in question was two years and two months old. There is no issue as to paternity. He had been born in 1964 in Massachusetts where his parents, though not lawfully married, were living together. They remained together for about six months after the child's birth and then separated. The child has resided with the mother ever since.

In 1969, the mother married Richard " Roe " [" Roe " being fictitious] in New York State and a little over a year later the " Roes " filed a petition in the Surrogate's Court, Kings County, to adopt the child. The father appeared in the proceedings and objected to the adoption on the ground that it would impair his rights under the 1966 agreement. He asserted that he at all times had performed his obligations under the agreement, while the mother had accepted all the benefits but failed to live up to her obligations. The father obtained an adjournment in the adoption proceedings and thereupon instituted an action (based on the agreement) in the Supreme Court, Kings County, to permanently enjoin adoption of the child by Richard and Isabel " Roe ".

The Supreme Court refused to accept jurisdiction and granted a motion by the " Roes " to dismiss the complaint. The court held that the entire matter, including the efficacy of the 1966 agreement, was before the Surrogate's Court and should be determined by that court. I agree and the order entered thereon should be affirmed (SCPA 201), without costs.

Upon taking up the matter again, the Surrogate determined that the agreement gave the father no standing to object to the adoption. The welfare of the child is the prime consideration for the court in any adoption proceeding and, to use the Surrogate's words, that could not be " the subject of barter ".

Here, the child's welfare required that the putative father's objection to the adoption be rejected.

On appeal, "Doe" again relies upon his "rights" under the agreement. He claims that the adoption should not have been granted until his rights thereunder were determined. This contention has no merit.

Under New York law the putative father has no parental rights with respect to a child born out of wedlock (see *Matter of Hardenbergh,* 144 Misc. 248, 251). This is forcefully illustrated by subdivision 3 of section 111 of the Domestic Relations Law, which states that the consent of the mother only is required for the adoption of a child born out of wedlock. Since the father has no rights, his consent is not needed. He need not even be notified of the adoption proceedings. Therefore, that portion of the agreement which states that the father's relinquishment of custody of the child " shall not be construed to be a consent on the part of the Father to the adoption of the Child by any other person " is meaningless. His consent or lack of it is irrelevant. Furthermore, the agreement cannot be interpreted as one whereby the mother agreed that the child would never be offered for adoption, because, as the Surrogate noted, such an agreement would ignore the welfare of the child and would be against public policy (see *Stickles* v. *Reichardt,* 203 Wis. 579, 582–583).

Similarly, the putative father cannot set up the fact that he supported the child pursuant to the agreement since 1966 as a bar to adoption. He was simply fulfilling his legal obligations (Domestic Relations Law, § 33) and that gave him no " rights " to the child (see *Clements* v. *Banks,* 159 So. 2d [Fla. App.] 892, 893). Adoption is purely statutory. As stated in *Caruso* v. *Caruso* (175 Misc. 290, 291), " adoption is a status created by the State and not merely a contract between the natural parents and adoptive parents." The New York statutes give the putative father no rights prior to adoption and none after (Domestic Relations Law, § 117). On the other hand, the order of adoption changes the status of the child, destroys any parental relationship that may have existed between the child and the natural parents and creates a new relationship between the child and its adoptive parents which has all the incidents of a status (*Stickles* v. *Reichardt, supra*).

If we were to give effect to rights claimed by " Doe " under the 1966 agreement, it would greatly impair the new parent-child relationship, with very undesirable consequences to the child. This latter point, namely, what is best for the child,

is the key here and " Doe " barely alludes to it. The Surrogate found that the welfare of the child would be served by the adoption. That determination is fully supported by the evidence.

The adoption order, therefore, should be affirmed, without costs.

RABIN, P. J., HOPKINS, MARTUSCELLO and SHAPIRO, JJ., concur.

Order of the Supreme Court, Kings County, dated June 4, 1971, affirmed, without costs.

Order of the Surrogate's Court, Kings County, dated June 23, 1971, affirmed, without costs.