210 N.J. Super. 186 (1985)
509 A.2d 283
JOHN J. BACKES, JR., PLAINTIFF,
v.
CATHOLIC FAMILY & COMMUNITY SERVICES AND THE OFFICE OF THE REGISTRAR OF VITAL STATISTICS OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Passaic County.
November 4, 1985.
*187 Edward A. Genz, for plaintiff (Blankenhorn & Ragen, attorneys).
*188 Katherine M. Lordi for defendant Catholic Family & Community Services.
Roberto Alcazar, Dep. Atty. Gen., for defendant Registrar of Vital Statistics of State of New Jersey (Irwin I. Kimmelman, Atty. Gen.).
DWYER, J.S.C.
Subsequent to the decision set forth in the Appendix, attached hereto, the court conducted an evidentiary hearing on the question of "good cause."
Backes testified in support of his application. He is 35 years of age. He married Judith Backes on March 22, 1975. They have three children: two daughters, 8 and 7, and a son four-and-one-half years old.
Backes stated that he was adopted. He stated that his interest in information about his natural parents became important to him when his wife was pregnant with their first child. He testified that his interest in his natural parents increased over the years.
In September 1983, he contacted the Agency. In November 1983, he and his wife had a meeting with one of the staff and received a statement of the background of his natural parents without identifying details. (P-1). The statement identifies the ethnic, religious, and family background of each parent, the circumstances of his birth and the reasons given by his biological mother for placing him for adoption. The staff member reviewed it in detail with Backes and his wife. The staff worker advised him that if he had further questions to contact her.
Backes stated that he reviewed the statement. He testified that he wanted more information about his natural parents. He wanted something more than words.
He is a college graduate. He has had stable employment with his present employer for several years.
*189 Concerning his interview with Dr. Irvine Markowitz, M.D., an expert witness for the Agency, Backes stated that he discussed his background, his increasing anxiety and frustration in not getting information; and, he concluded with his impression of Dr. Markowitz. He said that he was a nice man but had a negative attitude toward the responses that Backes gave to the questions. He testified that he could not answer Dr. Markowitz's questions as to why he wanted to know more about his natural parents.
Backes further stated that he had not told his adoptive parents of his inquiry about his natural parents.
On cross examination he stated that he had lived with his adoptive parents until one-and-one-half years before he married at the age of 25. He knew from the age of four that he was adopted, when one of the family cousins of his adoptive parents told him.
He confirmed that he had made no contact with the Agency when his three children were born. He also confirmed that he had held progressively more responsible positions with his employer through the time of the hearing.
In respect to his adoptive parents, he testified that he was no longer a minor and did not need their permission to find out about his background.
He also testified that in 1977, in connection with his adoptive father being in Sloan-Kettering for treatment for a tumor, he heard his adoptive father say that he wished he had not trusted the adoption process. Backes also stated that the Backeses had adopted another child with whom he remained in contact and who was present at that conversation.
He further stated that he had not consulted doctors about anxieties, because he did not need counselling or medicines to resolve his problems.
He stated that his problem started after he got the statement, P-1, from the Agency. He wanted to know more  the *190 medical history, the history of both families, and his place of origin.
In response to questions by the Deputy Attorney General, he testified that one of his daughters had a heart murmur. But he further testified that the treating doctors do not regard the family history as important for purposes of treating her.
He further stated that he had discussed with his adopted brother his desire to know more of his past on several occasions. There is no indication that they are biological siblings. He testified that he did not want his life to go by without meeting his natural mother.
Judith Backes testified that she was with her husband when he received P-1. After he received it, she noticed changes in him. He became obsessed with it. He carried it with him. He changed from being an easy going person to one who was irritable and argumentative.
She further stated that he told her before marriage that he had been adopted. He renewed the subject when she was pregnant with their first child. After he received P-1, he changed. He went to an attorney so that someone would share the work with him. He never wanted counselling to solve any problems related to stress and anxiety.
Sharon Bell testified for Backes. She stated that she placed a child for adoption when she was 16. She is now married and has two sons, 9 and 11 years of age. She has been married for 15 years.
She stated that when her first son was born she had a personal crisis. She was in therapy for two months and worked out of it. She discussed her placing a child for adoption with her husband but not with her own mother.
She further stated that she felt that there was a large blank in her life. Her daughter's father was oriental and she felt that her daughter should know that.
*191 She stated that she had done a lot of investigation for a lot of people. Using the techniques she had learned, she was able to locate her child. She stated that she sent her daughter a letter to an address which she had obtained. She then described a telephone call that she received from her daughter in response to her letter. The daughter described her condition. She did not have her daughter meet her family. She went to the daughter. The daughter had no family, so she stayed with the daughter. She stated that they have had an ongoing relationship. She finds that she is at peace with herself.
On cross examination she stated that a friend who is a member of Alma asked her to testify in this case. She said that she is one of them, but has not joined the organization. She does investigation for adoptees.
Alma is for adoptees; she is not an adoptee. While they have their needs, she stated, her needs were different.
In response to questions from the Deputy Attorney General, she stated that her daughter had never undertaken any effort to locate her.
Michele Rabinowitz, Psy. D., testified as an expert for Backes. She has B.A. and M.S. degrees. She received a doctorate in psychology from Rutgers in 1979. She has been licensed as a psychologist in New Jersey since 1979. She is a consulting psychologist to school systems and maintains her own practice.
She examined Backes in her office in February 1985 for about one hour. She had read the opinion set forth in Part I, supra, interviewed him, and utilized 15 cards from the Thematic Aperception Test.
She indicated that following receipt of P-1, Backes stated he became more irritable and argumentative in his daily life, but he did not think that it interfered with his job performance. He becomes volatile and frustrated when he meets resistance to his efforts to get information about his birth parents.
*192 She stated that the results of the Thematic Aperception Test did not indicate any pathological problems. The test reveals some consistent and unique themes. Some indicate loneliness and abandonment as well as daydreaming and fantasy. The themes indicate a concept of not being able to resolve certain problems, which she attributes as the cause for stress he has from not having information to resolve problems about his background.
In her testimony, Dr. Rabinowitz testified that she felt his anxieties have subsided. She also stated that many of her conclusions were based on her observations and judgments rather than information given to her by Backes.
She stated that there was no history of anxiety or volatility prior to November 1983. There was manifestation of anxiety because of his interactions with his wife. She did not remember the cause of the anxiety and had made no notes concerning the subject matter of differences with his wife. He did not mention specific problems at work. She did not pursue the subject, because she was not concentrating on work problems. She found no problems related to the fact that his college degree was in art and his present work has little relationship to art.
The results of the Thematic Aperception Test are related to the interpretative answers. She did not give a battery of tests, because she was not doing a total evaluation of Backes. She sought to find out what themes he found in his life. She found, in response to 5 out of 15 cards, there were themes of loneliness and abandonment. In respect to 7 out of 15 cards, where he was asked to tell what story the cards projected, he could not end the story. The story itself does not matter to a psychologist but the inability to end them does. It was indicative of his unresolved life status. She found his statement that a card depicting a boat on a river near a tree as one having a "blurred background" unique. No one else had ever described *193 that picture that way. She concluded that it was indicative of his anxiety over lacking information about his natural parents.
She explained that in her experience adoptees desire that information to have a feeling of better control over their lives. She stated that his need to know is based on his need to integrate information about his background into his self image. She stated that it is normal to ask about ones' past, but most people have information to resolve the questions about their past.
She agreed with a statement in Dr. Irvine Markowitz' report that Backes is secure in his own identity. But she disagreed that the added information would not be helpful. It is not just a question of making him happy but aiding him to resolve open questions about his origin.
Dr. Irvine Markowitz, who has been a licensed physician in New Jersey since 1946, and a Diplomat of the American Board of Psychiatrists since 1951, ("Markowitz"), testified as an expert for the Agency. He is the Medical Director for the Orange Foundation and Child Services for Maplewood and the Oranges.
He testified that he conducted an oral examination of Backes but stated that he administered no tests. Based on his examination, he found that Backes was emotionally stable and had no emotional problems. He further stated that considering the average run of people, he found that Backes showed no signs of emotional needs with any deprivation.
He also testified that, in his opinion, Backes had no psychiatric need to receive any further information concerning his natural mother. He stated that his opinion was based on the fact that Backes was very certain that he had an absolute right to know all about his natural mother and had an idea that it would be useful for his children to know their genetic history. But from his discussion with Backes there was no indication that either Backes or his children have any gross difficulties for which such information would be useful. He was aware that *194 one child of Mr. and Mrs. Backes had a heart murmur, but Backes is not seeking information for this reason.
He stated that, in his opinion, Backes was very sure of what he wants but he has not considered fully what jeopardy his pursuit creates for the emotional lives of others. In his opinion, there is no emotional or medical need for further information about his natural parents for himself or his children.
On cross examination he conceded that he referred to Backes as James instead of John. He further stated that Backes expressed the view that his natural parents should want to meet him. Dr. Markowitz conceded that having more information about his background could be helpful medically.
He stated that if a patient had a great deal of stress and anxiety one would have to find the cause of it. One could not just rely on the verbal statements of a patient. Based on his examination, he found no symptoms of burning anxiety. He did not regard Backes as a foolish individual, but he did consider the expressed anxiety to be false. In his opinion some of the symptoms of loss of appetite and loss of sleep can be related to other pressures, such as those associated with the litigation and other phases of living.
Betty Borenson testified for the Agency. She has an M.S. degree from Columbia University. She has worked for the Agency since 1980. She has been Adoption Coordinator since 1983. She works with women who are pregnant, potential adopting parents, birth parents and adoptees. When Backes contacted the Agency, she handled his request for information about his birth parents. He telephoned in September 1983. She explained that the Agency would provide all non-identifying data. She would check the records and get back to him.
She stated that it is the Agency's policy to honor the commitment of confidentiality to the natural parents and the adopting parents. She testified that each request is reviewed individually.
*195 When she located the records for Backes she arranged a meeting with Mr. and Mrs. Backes. She stated that it is the policy of the Agency to have a personal meeting. The reason for this is to evaluate the emotional states of the individuals and to see how they respond to the information.
During the meeting all the details of P-1 were reviewed. She stated that Backes was proud of his family, pleasant and interested in the information. The meeting lasted one hour.
Backes telephoned about one week later. He wanted to know the time of his birth, whether he was baptized before he was placed for adoption, and the identity of his mother so that he could make contact with her. She declined to give the latter. She had one other direct telephone call from him.
She stated that the Agency has received about 15 inquiries from adult adoptees for information. It is the agency's policy to provide non-identifying information about circumstances surrounding the adoption, as well as medical history, general physical descriptions of the birth parents, ethnic, and religious information about them.
On cross examination she stated that it is the policy to honor confidentiality but it depends upon the circumstances. At the time of the hearing, the Agency had under review a request from a treating physician for an adoptee for genetic information. The adoptee was over 20 years of age.
In connection with inquiries for background information, the professional staff has input in the decisions. The Agency also places in all files letters from adoptees and from natural parents. If there should be a match, the Agency's stated policy is that it would honor the request. On cross examination by the Deputy Attorney General, she stated that the Agency has never had a match. She further stated that confidentiality applies to natural parents, adopting parents, and adoptees.
Father Vitello, Director of the Agency testified. He holds a Masters degree in Social Work from Rutgers University. He *196 has been the Director since 1971. Prior to that he was a case worker and director of a residential treatment center.
He testified that the Agency is an approved Child Placement Agency by the State of New Jersey. The Agency started in 1937. Since 1946, when adoptions increased, the Agency has placed 1,300 children. Since 1983, he stated that the Agency received about 15 requests from adoptees for information about natural parents.
Upon receipt of a letter in January 1984 from Backes, he became involved. He discussed the matter with Ms. Borenson and inquired whether there was any communication from the natural parents. He checked to see if there were other circumstances and found none.
He responded to Backes' letter. He then received a letter from Mr. Genz, the attorney now representing Backes, requesting the original birth certificate. He responded that such records were confidential and would not be released.
At the trial he pointed out that the Manual of Standards For Adoption Agencies issued by the Department of Human Services, Division of Youth and Family Services, (September 1, 1981), D-1, provides that adoption agencies maintain certain records.
The following statements are taken from that manual:
N.J.A.C.10:121A-3. Records
(a) General requirement:
1. All records required to be maintained by the agency pursuant to this chapter shall be open to inspection by an authorized representative of the Bureau, for the purpose of determining compliance with this chapter.
2. All records shall be kept in metal file cabinets protected from fire damage, theft, and unauthorized scrutiny. [Id. page 16.]
....
(j) Confidentiality:
1. The agency shall maintain the confidentiality of records of the child, birth parents and adoptive parents except by order of the court.
2. Staff members of the agency shall not disclose or knowingly permit the disclosure of any information concerning the child, birth parents and adoptive parents to any unauthorized person(s). [Id. at 21-22.]
*197 On cross examination he stated that he made his own check on Backes with the staff to see if there were extenuating circumstances such as medical reasons or a request from a physician. He stated that if the court ordered an attempt at contact with the biological parents be made, the Agency would make every effort to carry out the order of the court.
He stated that since 1981 some agencies have placed provisions for biological parents to indicate consent to further contact in the files pertaining to adoptees. He attributed the change to the increasing number of requests. He stated that 35 years ago there were very few requests.
Ruby Lee Piestar was a witness called by the Agency. She had received a degree from the University of Texas in 1959. She had been Executive Director of the Edna Glading Home in Fort Worth, Texas for 22 years. She has been a consultant and advisor to that Home for the last two years. She has been a member of the National Association of Social Workers for many years and has served with the Child Welfare Division for 43 years. The Agency offered her as an expert on the problems of adoptees and birth mothers.
She stated that she started working with adult adoptees when she joined the Edna Glading Home. She persuaded the trustees to adopt a policy for background folders to be placed with the child to be adopted. The background folders contain information on the ethnic background of the birth parents, ages, some general physical description, and education of the birth parents, and the medical histories of the families of each parent to the extent known. This information was furnished as requested.
She stated that the Home had placed 22,000 children. There had been inquiries for further information from about one percent of those placed.
She testified that there were weekly group meetings with those at the Home. She testified one of the great concerns of the expectant mothers was confidentiality. They were concerned *198 whether they could go back to the community where they came from. They were concerned that someone might knock on their door.
She further testified that she was familiar with an organization of 140 adult adoptees. She stated that its policy was to support confidentiality.
She gave comments about birth mothers who were intruded upon. She stated in one case where contact was made through relatives, the child of the subsequent marriage of the birth mother became upset.
On cross examination she explained that under Texas laws adoption agencies were prohibited from giving out confidential information about birth parents and adoptees. She further stated that in 1984, the Texas Legislature had amended and supplemented the laws relating to confidentiality of birth records in adoption to provide for registries where birth parents and adoptees could register if they were willing to have contact with the other.[1] *199
*200 On cross examination she stated that she was familiar with the Adult Adoptees Association. She acknowledged that she was a member of the National Committee for Adoption and a *201 Vice President of that organization. She acknowledged that she had been contacted to appear as a witness in this case. She further stated that she paid her own expenses to come.
She further testified that Father Vitello was a member of the group that had worked on drafting the Model Adoption Act. In response to the suggestion that the first draft of the act provided for open records concerning adoptions, she testified that proposal was not approved.
Phyllis Ettinger, Director Division of Adoptions for the last 8 years of the Child Aid and Adoption Society of New Jersey testified for Backes after all other testimony was presented. It is a private non-sectarian social service agency. It has offices in the Oranges, Morristown and Bogota. She earned a Masters degree in social work at Columbia University in 1952. Prior to working for the Society, she worked for the Division of Youth and Family Services for 8 years. She has been with the Society for 25 years.
She testified that in response to requests by adult adoptees for contact with birth parents, the Society will undertake such searches in certain circumstances.
The request must be in writing. There must be a personal interview with the person making the request. The Society makes non-identifying background information available. In appropriate cases where the request is from an out-of-state resident, the Society waives the personal interview for non-identifying background information.
If after the personal interview the adult adoptee wants to pursue contact, then the Society insists that the adoptees have the benefit of counselling so that they fully understand what is involved.
She testified that she was familiar with reunions of a birth mother and adoptee. In her opinion most are successful. Relatives and close friends are not involved. She estimated that her information was based on experiences of between 30 and 50 cases. She was personally involved with 10. She knew of *202 three cases where the birth mothers refused. The cases beyond the 10 with which she was involved were based on reports which she had heard about.
On cross examination she explained that a successful reunion did not mean necessarily a face-to-face meeting between birth parent and child, but identifying information. She further stated that in considering such requests, there is a need to look for potential dangers. If there is any question, then a psychiatrist is asked to make the decision. If there is a danger, then that is the end of the proceeding. She had one previous case where the inquiry ended.
She further testified that beginning in December 1982, the Division of Youth and Family Services had enlarged the Medical Information Form to a detailed 13-page report.
The report attempts to cover the medical history of each of the birth parents, their respective parents and siblings, and in the case of children born in foreign countries, contagious and infectious diseases common in such foreign country, as well as detailed information about the medical history of the pregnancy and delivery. There is a detailed medical report on the child. The adoptive parents are given a copy of the report.
Under N.J.S.A. 9:3-31[2] a court must find that "good cause" exists to enter an order directing the clerk of the court *203 to open the records pertaining to adoptions. Although the words "good cause" do not appear in N.J.S.A. 26:8-40.1, the court construes that statute to mean that a court, prior to entering an order directed to the State Registrar to open sealed birth records, must find that "good cause" exists.[3]
As noted above the regulations pertaining to licensed or approved adoption agencies require that the information which they gather about birth parents and adoptees must be kept confidential unless a court orders otherwise. This court concludes that an order directed to an adoption agency to open its records must likewise be founded upon "good cause."
This court agrees with Judge Gruccio's statement in Mills v. Atlantic City Dept. of Vital Statistics, 148 N.J. Super. at p. 312:
The Legislature recognized that this right to privacy also cannot be made absolute, that parties such as the adult adoptees here may have a countervailing interest which may warrant disclosure in spite of assurances of secrecy. For this reason the Legislature provided in N.J.S.A. 9:3-31 that upon good cause shown a court may order that the records be revealed to the party making the proper application. The statutory provision vests in the court the power to weigh and balance the competing privacy rights and make a determination based on the facts and circumstances of each individual case.
*204 A court must find upon facts relevant reasons to support its action where "good cause" must be shown. Cf. State In Interest of B.C.L., 82 N.J. 362 (1980); In re L.C. and E.R.C. Adoption, 85 N.J. 152 (1981).
The Agency urges that in addition to the interests referred to by Judge Gruccio in Mills, supra, there is the need of adoption agencies to maintain credibility with those to whom assurances of confidentiality are given and that those assurances will not be disregarded without cause.
Based on the credible evidence, the court finds that adoption agencies and those who are charged with their regulation have been conscious of the need for more information about the medical histories of the birth parents. The Division of Youth and Family Services has in its 1982 form amply demonstrated that detailed information insofar as it is known shall be provided. (D-1, p. 34).
The credible evidence also demonstrates that the compilation of such information as a normal part of the adoption process started in the last 20 to 25 years. In the absence of such information for treatment or guidance of an adoptee or the adoptee's child or children, this court believes that there would be good cause to make a contact with a birth parent to secure that information.
Based on the information in the record, there is no showing that such a complete medical history is available for Backes. But the credible evidence does not establish that any need exists at this time for additional medical or genetic information.
Both experts agree that Backes has no psychological problem of a pathological nature. Both experts agree that he is emotionally stable and well adjusted.
Backes has testified that there is no need for additional medical information for the treatment of his one child.
Based on the testimony of Dr. Rabinowitz, the court finds that she concluded that Backes had problems in completing his *205 own self-image because of the lack of information about his birth parents. Dr. Rabinowitz did not testify about any exploration with Backes of adverse consequences to himself or to his birth parents of making contact.
Based on the testimony of Dr. Markowitz, the court finds that Backes has the belief that he has an absolute right to information about his birth parents. Backes further expressed views that in Dr. Markowitz's opinion suggest that Backes believes his birth mother should want to talk to him.
The court concludes from the credible evidence that Backes does not consider that any adverse consequences would ensue as a result of a contact with his birth parents.
Both experts agreed that there was no manifestation of stress or anxiety prior to 1983 when P-1 was made available to Backes. Both agreed that, at least at the time of examination, the manifestation of stress and anxiety had subdued. Neither was prepared to relate either the stress or the anxiety to the lack of information about his birth parents.
As noted above, Father Vitello testified that the Agency keeps requests from birth parents for contact with adoptees with the files for adoptees as well as requests from adoptees for contact with birth parents. He testified that if there is a match, then contact would be arranged.
From other credible testimony and the reference to the Texas law, the court finds that those associated with adoption agencies as well as others have sought and obtained the development of better organized and better maintained registries for such requests to be filed and matched but with adequate safeguards for confidentiality.
Based on the credible evidence before it, the court concludes that there has not been a showing of good cause to make the sealed information available to Backes. But that is not the final question. This is a case where there is at present no *206 consent from the natural parents. Judge Gruccio suggested in Mills, supra:
The agency may approach the natural parent to solicit consent to the release of the identifying data and obtain court approval to broker a contact. .. . If the agency or the biological parent refuses to consent to the divulgence of identifying data, the adoptee shall have a right of appeal to this court. On the basis of the adoptee's and a report from the investigating agency, the court shall then make a decision. Additionally, where the agency's investigation fails to locate the natural parents the adoptee may appeal to the court for the information necessary to carry on the search. [Id. at 321.]
The Deputy Attorney General appearing for the State Registrar represented to the court that the Division of Youth and Family Services, since the Mills decision, supra, has regularly undertaken to make contact with birth parents to consent to the release of identifying information and contact. No one from the Division of Youth and Family Services was called as a witness to state the Division's practice or experience. So far as the court can determine the Division has not changed any regulations which it has issued to reflect such practices.
The suggestion from the Mills decision, supra, quoted above indicates that where adult adoptees make the request, in the absence of a showing by the appropriate official of the State or adoption agency, the court should, on a case-by-case basis, develop guidelines for contact with the natural birth parents.
Although there is some evidence in the record that contact with natural parents has not been devastating to the child in some cases or to the birth parent in others, implementation of the above quoted suggestion in Mills will involve the court in regulating the conduct of the Division of Youth and Family Services and adoption agencies in respect to adult adoptees and their natural parents.
In reviewing reported cases[4] in preparing this decision, the court has noted that at least three states, Texas, Oregon, and *207 New York[5] have adopted public registry laws where adult adoptees and natural birth parents may register their consent to release of information and to contact.
None of those laws affords to an adult adoptee access to the confidential information absent consent except under defined circumstances, such as need for medical or genetic information, death of the natural parent, etc.
The New York law provides in the Public Health Law, § 4138-d 4.(b), that if the Department of Public Health determines that there are no corresponding consents then it shall notify the relevant adoption agency which shall notify the registrant. "The agency shall not solicit or request the consent of the non-registered person or persons."
The court recognizes that in enacting legislation different legislatures may weigh and consider different policies in deciding what should be the law.
There presently is pending in the Assembly, Bill No. 375, which would amend N.J.S.A. 9:3-37 et seq. and have an impact on N.J.S.A. 26:8-40.1, and Bill No. 814, which authorizes a registry for consent by adoptees and birth parents as well as disclosure of certain non-identifying data without consent to adoptees over 18 years of age.
*208 This court declines to follow the suggestion in Mills, supra, to appoint an intermediary to make contact with the birth parent.
To implement the suggestion this court would have to undertake the regulation of the activities of the Division of Youth and Family Services and other adoption agencies.
This court concludes that such regulation should come from the Legislature.
Counsel for the Agency shall submit a judgment in conformity with this decision. No costs to either party.

APPENDIX

December 11, 1984.
DWYER, J.S.C.,
Plaintiff John J. Backes, Jr. ("Backes") filed a motion to strike interrogatories served by defendant Catholic Family & Community Services, which is an adoption agency licensed by the State of New Jersey ("Agency"), that purportedly seek information to determine whether there is a medical or psychological need for Backes to have access to the sealed records concerning his birth and adoption. See N.J.S.A. 9:3-31 and N.J.S.A. 26:8-40.1.
Relying upon Mills v. Atlantic City Dept. of Vital Statistics, 148 N.J. Super. 302 (Ch.Div. 1977), counsel for Backes urges that plaintiff should not be required to answer any interrogatories at this time because Backes is 35 years of age and therefore falls into the category of adult adoptees under the guidelines suggested in the Mills decision. Counsel urges that under a proper interpretation of that decision when an adult adoptee seeks to examine the records pertaining to his birth and adoption, the court should direct that an intermediary, preferrably the adoption agency, be appointed to contact the natural parents to see if they would consent to the release of such documents, and if so, *209 the court could then authorize the intermediary to broker a contract between the adoptee and the natural parents.
Under this procedure, counsel urges that there is no need for any discovery or for any hearing to determine if "good cause" exists to open the records under the statutes cited above. Further, it will save Backes the expense of medical and psychological experts.
Finally, counsel urges that the Agency should not be appointed the intermediary, in any event, because it opposes making any inquiry of the natural parents unless and until Backes has been put to the trouble and expense of establishing "good cause." Counsel argues that this is contrary to the statement in Mills, supra:
In the case of adult adoptees who request access to their own birth records, the burden of proof should shift to the State to demonstrate that good cause is not present. In certain situations the request of the adult adoptee for information should be granted as a matter of course. Where the natural parent has placed on file a consent to identification with the agency who [sic] placed the child, access by the child should be automatically allowed.... [Id. at 318, (372 A.2d 646).]
The brief filed by the Deputy Attorney General appearing for the Registrar of Vital Statistics joined in the request for the appointment of an intermediary to inspect the records and to attempt to contact one or both of the natural parents.
In the papers filed in opposition to the motion, it is stated that Backes contacted the Agency some months ago. The Agency was the one which handled his adoption. At the time of initial contact, Agency personnel furnished to him non-identifying information about the background of his parents.
The Agency also explained that it keeps in its files requests for contacts from natural parents and from adoptees. When there are requests from both parties, the Agency notifies both parties of the mutual requests.
Counsel for the Agency urges that the decision in Mills, supra, is not controlling on this court. Counsel also urges that Mills, supra, should not be followed because no adoption agency *210 was a party to that action but only the officials in charge of the sealed records and the adoptees.
Counsel for the Agency points out that in Mills, supra, Judge Gruccio was aware of the needs and rights of the natural parents.
The court is determining whether the records should be revealed must weigh the adoptee's needs against the natural parents' rights. Neither party has an absolute right. Additionally, once information has been released, the adoptee's actions in attempting to contact the natural parent will be difficult to oversee. The testimony of Florence Fischer, an adult adoptee, who contacted her natural parents demonstrates that unlimited access to the information may result in unwarranted intrusion. [Id. at 320, (372 A.2d 646).]
Counsel for the Agency states that the Legislature has balanced the needs and has determined that the records of an adoption should be sealed and not opened "unless the court, upon good cause shown, shall otherwise [order]", N.J.S.A. 9:3-31(A), and has also directed that the original birth records of adopted children, unless the circumstances set forth in N.J.S.A. 26:8-40.1 are shown, are to be sealed and "such seal shall not be broken except by order of a court of competent jurisdiction...." Agency's counsel argues that under those statutes this court must find that "good cause" exists before it may order an intrusion on the privacy such laws promised the natural parents at the time of the adoption.
Counsel for the Agency finally urges that the mere allegations in an unverified complaint and a certification signed by the attorney for Backes cannot be a basis for this court to find "good cause" regardless of which party has the burden of proof.
This case, as presented, does not attempt to raise any of the constitutional issues raised in Mills, supra. See also Alma Soc. v. Mellon, 601 F.2d 1225 (2nd Cir.1979) cert. den., 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979), holding provisions of New York statutes denying access to adoptees' birth and adoption records except for good cause shown valid under the United States Constitution.
*211 Except for Mills, supra, counsel have not cited any other case dealing with the showing of "good cause" to obtain access to an adoptee's birth and adoption records.
In In re Linda F.M., 95 Misc.2d 581, 409 N.Y.S.2d 638 (Surrog.Ct. 1978), the court held that an adult adoptee had not shown good cause for access to her birth and adoption records under § 114 of the N.Y. Domestic Relations Law. Among the contentions advanced by the plaintiff in that case was that the provisions sealing records should be construed as not applicable to adult adoptees. The court said that such a contention rested solely upon the language of the statute. In construing statutes, it continued, it must seek the intent of the Legislature and only where alternate interpretations are possible or the meaning is unclear, may the court resort to the tools of construction. It continued:
The discharge of this function does not confer upon the judicial branch of government the power, under the guise of construction, to legislate by amending, modifying, extending, or otherwise creating a statutory provision alien to the clear language of that which has been enacted by the legislature and signed by the governor. Matter of Anonymous (St. Christopher's Home), 40 N.Y.2d 96, 102, 386 N.Y.S.2d 59, 63, 351 N.E.2d 707, 711 [1976]; Matter of Malpica-Orsini, 36 N.Y.2d 568, 571, 370 N.Y.S.2d 511, 514, 331 N.E.2d 486, 488 [1975], app. dsmd. 423 U.S. 1042, 96 S.Ct. 765, 46 L.Ed.2d 631 [1976]; Bright Homes v. Wright [8 N.Y.2d 157, 203 N.Y.S.2d 67, 168 N.E.2d 515], supra; Allen v. Minskoff, 38 N.Y.2d 506, 381 N.Y.S.2d 454, 344 N.E.2d 386 [1976]; Lawrence Constr. Corp. v. State of New York, 293 N.Y. 634, 639, 59 N.E.2d 630, 632 [1944]; Sexauer & Lemke v. Burke & Sons Co., [228 N.Y. 341, 127 N.E. 329 (1920)], supra.

On this subject, Judge Cardozo, speaking for a unanimous Court of Appeals cautioned that, "Freedom to construe is not freedom to amend." (Sexauer & Lemke v. Burke & Sons Co., supra, 228 N.Y. at 345, 127 N.E. at 311). In re Linda, F.M., supra, 409 N.Y.S.2d at 640.
Judge Cardozo went on to explain:
Petitioner cites no statutory language limited nor period in which an adoption record remains sealed, nor can the court discern any express or implied intent in the statutes which would support the construction sought by petitioner. A reading of all the sections of the Domestic Relations Law applicable to both agency and private placement adoptions does not disclose any possible basis for concluding that between the lines of the explicit language constituting the *212 statute governing the sealing of adoption records, there exists an unexpressed intent on the part of the Legislature that the provisions with reference to such sealing of adoption records are not applicable to adoptees who have reached their majority.
In interpreting adoption legislation, it must be further remembered that adoptions were unknown to the common law. Adoption is a procedure that exists only by dint of statutory enactment. [Citation omitted]. Since adoption statutes are in derogation of the common law, they must be strictly construed ("Doe" v. "Roe", 37 A.D.2d 433, 436, 326 N.Y.S.2d 421, 425 [1971]; Caruso v. Caruso, supra [175 Misc.2d 290, 23 N.Y.S.2d 239],; Matter of Santacose, 271 App.Div. 11, 16, 61 N.Y.S.2d 1, 5; Matter of "Wood" v. "Howe", 15 Misc.2d 1048, 1050, 182 N.Y.S.2d 992).
It is accordingly concluded that the statutes whose construction have been placed in issue by petitioner provide that all records of adoption are sealed forever unless opened by an order of a court of appropriate jurisdiction upon the establishment by a petitioner of good cause. The applicable statutes make no distinction between a record of a private placement or an agency adoption, nor do they differentiate between a record where the adoptee is now an adult or one in which the adoptee is still an infant. [Id. (409 N.Y.S.2d) at 641.]
After reviewing the evidence offered on behalf of plaintiff, the court concluded:
The evidence adduced fails to even suggest, let alone sustain, any conclusion other than that the motivating cause for the application is petitioner's curiosity. To conclude that mere curiosity as to one's natural forebears constitutes good cause within the framework of Domestic Relations Law Sec. 114 would render the clear import of the statute meaningless. Every application to unseal adoption records would have to be perfunctorily granted. This would be a result where by judicial fiat the clear provisions of the statute would be routinely ignored. Such a course would be no less than blatant judicial intrusion into the legislative process. It is accordingly concluded that petitioner has failed to establish a statutory right to relief. [Id. at 642-643.]
In the case of In re Linda F.M. v. New York City Health Dept., 52 N.Y.2d 236 [437 N.Y.S.2d 283], 418 N.E.2d 1302 (Ct. of A. 1981), the Court of Appeals affirmed the decision below. It said:
Although petitioner now an adult, has obtained the approval of her adoptive mother for her attempt to gain access to the adoption records and her adoptive father is deceased, the natural parents retain a potentially strong interest in maintaining their anonymity. It thus is essential that petitioner make a showing of good cause. A natural parent understandably can feel deep effects when the records of an adoption are opened years after the child was surrendered for adoption. Although the sudden reappearance of the child may often be a source of great pleasure to the natural parent, in other cases it may be a destructive intrusion into the life that the parent has built in the years since the *213 adoption. It may be the source of much discomfort. In some cases, it may even open the way for the child or others to blackmail the natural parents by threatening to disclose embarrassing circumstances surrounding the birth. [Id. (437 N.Y.S.2d at 284, 418 N.E.2d) at 1303.]
... A desire to learn about one's ancestry should not be belittled. When balanced against the interests of other parties to the adoption process, however, it cannot alone constitute good cause under section 114. This is not to say that concrete pyschological problems, if found by the court to be specifically connected to the lack of knowledge about ancestry, would never constitute good cause (see Matter of Anonymous, 92 Misc.2d 224, 399 N.Y.S.2d 857 [1977], supra). By its very nature, good cause admits of no universal, black-letter definition. Whether it exists, and the extent of disclosure that is appropriate, must remain for the courts to decide on the facts of each case. Nevertheless, mere desire to learn the identity of one's natural parents cannot alone constitute good cause, or the requirement of section 114 would become a nullity. Petitioner, therefore, has failed to meet the statutory prerequisite to gaining access to her records. [Id. (437 N.Y.S.2d at 285, 418 N.E.2d) at 1304.]
The trial court, in a decision reported as Matter of Linda, F.M., 92 Misc.2d 828, 401 N.Y.S.2d 960 (Surog.Ct. 1978), said that its review of the records had satisfied it that contact with the natural parents was not likely to be made because of the lack of information in the records. The court therefore concluded that it would not appoint a guardian ad litem to represent the interests of the natural parents but added that the court questioned whether any steps should be taken until plaintiff established good cause.
The Court of Appeals said:
This appeal also raises the issue of whether notice of such a proceeding should also be given to the natural parents. Although the notice provision of section 114 specifically mentions only the adoptive parents, the interests of the natural parents dictate that notification be given if the court finds that the petitioner has made a showing of entitlement and provided that the natural parents can be located with reasonable effort and in a manner that will not be likely to be self-defeating by revealing their identities to the adoptive parents of others. Such notice provides the natural parents with an opportunity to intervene and defend their interest in retaining anonymity (cf. Matter of Anonymous, 89 Misc.2d 132, 390 N.Y.S.2d 779; 92 Misc.2d 224, 399 N.Y.S. 857, supra). Because this interest may not receive full articulation in their absence, it is important that those who may be vitally affected by disclosure be given a chance, if practical, to intervene. [Emphasis supplied; (437 N.Y.S.2d at 285) 418 N.E.2d at 1304.]
In Sherry H. v. Probate Court, 177 Conn. 93, 411 A.2d 931 (S.Ct. 1979), the Connecticut Supreme Court reversed the judgment *214 of the lower courts denying a plaintiff access to her birth and adoption records on the ground that it was improper to apply a statute requiring the genetic parents to consent to the opening of the records where plaintiff's complaint was pending prior to the enactment of that statute.
The plaintiff was an adult adoptee at the time of the action. At age 16 she had asked the Jewish Family Service, which was the adoption agency that handled her adoption, about her background. She was given non-identifying information about her parents. She was born out of wedlock. Her father left the area when he learned of her mother's pregnancy. Her mother was a Russian Jew.
When plaintiff was an adult she informally applied to the Probate Judge of Hartford to see whether she could examine her records. The judge contacted the Jewish Family Service about the views of the genetic mother. The judge was told that the genetic mother did not want her identity revealed. The judge so advised her.
In a later communication with the adoption agency, plaintiff was told her genetic mother had never told anyone in her family of her pregnancy and did not want her identity revealed.
Plaintiff later filed a formal action to gain access to identifying information. The relevant courts, based essentially on the information outlined above but without any independent investigation, reached the conclusion that the genetic mother did not want to have her identity revealed and applying the statute that required such genetic mother's consent denied relief.
The Connecticut Supreme Court held that the subsequent statute did not apply. The court said the applicable statute required:
... the examination of the birth certificate by the adopted person is authorized only if the probate judge is of the opinion that disclosure would not be detrimental to the public interest, or to the welfare of the genetic or adopting parents. We must presume, however, that the legislature did not intend to enact useless legislation. J & M Realty Co. v. Norwalk, 156 Conn. 185, 192, 239 A.2d 534 (1968); and if we are to give effect to the obvious legislative intent *215 underlying the act  there be a careful evaluation and weighing of the respective interests of the parties  an investigation sufficient to ascertain those interests must be carried out. [411 A.2d at 935.]
That court further held:
Because of the nature of proceedings under Public Act 75-170, the court's investigation must also be independent. Under this act, proceedings in the Probate Court are not adversary proceedings; there is only one party, the applicant, before the court. The applicant cannot reasonably be expected to provide all of the information concerning the welfare of the genetic parents, whose identity is unknown to the applicant. Moreover, reliance on the applicant for information about the genetic parents places the court in an awkward position of looking to the applicant for information adverse to his or her petition. An independent investigation would serve to minimize the procedural irregularities which inhere in placing such a burden on the applicant, such as reliance on hearsay information concerning the genetic parents, and would reasonably reduce the likelihood of misrepresentation of the circumstances of the genetic parents. [Id. at 936.]
That court concluded that such investigation and determination as to whether any detrimental effect would occur to any interested party should be made before the records could be ordered upon.
In In re Roger B., 84 Ill.2d 323 [49 Ill.Dec. 731], 418 N.E.2d 751 (S.Ct. 1981), the Supreme Court of Illinois upheld the constitutionality of statutes requiring the sealing of birth certificates and adoption proceedings. It construed the relevant statutes as requiring an adult adoptee to show "good cause" before the records should be opened. That court held that where plaintiff did not show any medical, psychiatric or psychological need to have access to the information but only a "desire to know information which pertains to him as a person' good cause" was not shown for opening the records.
The following cases also require a showing of a medical, psychological or psychiatric need. Application of Maples, ___ Mo. ___, 563 S.W.2d 760 (S.Ct. 1978); Bradey v. Children's Bureau, 275 S.C. 622, 274 S.E.2d 418 (S.Ct. 1981); Application of Romano, 109 Misc. 99, 438 N.Y.S.2d 967 (Surog.Ct. 1981) (absent application of showing of good cause court would not direct appointment of investigator to make contact with natural parent.)
*216 The laws of the various states on access to sealed adoption records are reviewed in "Sealed Records in Adoptions: The Need for Legislative Reform," 21 Catholic Lawyer 211 (1975).
As the review of the foregoing authorities demonstrate, when confronted with the problem now before this court, the courts of other states have held that where the Legislature has prescribed a showing of "good cause" an adult adoptee must demonstrate some need beyond desire or curiosity before a court should authorize contact with the natural, or genetic parents, in violation of the confidentiality assured to them at the time of adoption.
This court construes the remarks of Judge Gruccio in the Mills case quoted above as shifting the burden of proof to the State in cases involving adult adoptees, where a natural parent has filed a consent for access with the adoption agency or the appropriate public official. The representations of the Agency to this court indicate that the natural parents have not filed such consent.
The more difficult question is posed by the language in Mills, supra, as to what Judge Gruccio said he would do:
The possibility of such disruption and intrusion into the lives of persons who will not be before the court to oppose the adoptees' applications makes it important that each request be referred to an intermediary agency for investigation, report and recommendation of the court. Requests by adult adoptees that come before this court will be assigned to the agency that made the adoptive placement.... The agency handling the inquiry will be acting as an arm of the court and will have full freedom in its response to the request, including use of the official court record. Where a natural parent has consented, court approval of disclosure should be automatic. The agency may approach the natural parent to solicit consent to the release of the identifying data and obtain court approval to attempt to broker a contact. The agency should not broker a contact between the adoptee and the natural parent if it judges that harm to either will result. Nevertheless, the agency should work to meet the explicit request of the adoptee if feasible. At no time in its investigation shall the agency reveal the nature of its inquiry to anyone other than the natural parent. If the agency or the biological parent refuses to consent to the divulgence of identifying data, the adoptee shall have the right to appeal to this court. On the basis of the adoptee's reasons and a report from the investigating agency, the court shall then make a decision. Additionally, where the agency's investigation fails to locate the natural parents the adoptee may *217 appeal to the court for the information necessary to carry on the search. [Id. (148 N.J. Super.) at 320-21.]
Agency urges that ordering an inquiry of the natural parent prior to plaintiff establishing "good cause" exposes the natural parent to all the risks and dangers of invasion of privacy which the adoption statutes have assured him or her before any counterbalancing need of plaintiff has been established.
As pointed out in several of the cases cited above and in the materials cited therein, except for three states, the majority of the states have adopted a policy of sealed records and there is no showing that it has not attained the legislative goals intended. Careful review of the authorities cited shows that some states have made access to such records more difficult. Cf. Sherry H. v. Probate Court, supra.
Based on the bare allegations of the complaint, this court cannot make any finding of good cause to break the confidentiality promised to the natural parents.
This court agrees with Judge Gruccio that where consent exists on both sides access should be automatic unless there is a public interest to the contrary established.
However, this court is persuaded that the analysis of the Court of Appeals of New York is correct. The mere filing of a complaint by an adult adoptee is not sufficient to establish good cause under the statute.
The court concludes that the plaintiff has the burden of proof that good cause exists. In this respect, Professor McCormick has noted that the term burden of proof "means the necessity of producing evidence, satisfactory to the judge, of a particular fact in issue. This burden is usually cast first upon the party who has pleaded the existence of the fact, but ..., the burden may shift to the adversary when the pleader has discharged his initial duty." McCormick, Evidence, § 636 (1954). The court directs that the interrogatories be answered within 45 days of the date of this decision.
*218 This court will schedule a pretrial before setting a hearing date to take evidence on "good cause."
The court will defer until the time of the hearing any decision on whether an intermediary should be appointed and which agency should be the intermediary.
Counsel for the Agency shall submit an appropriate order within ten days.
NOTES
[1] The full text of the law is 36 pages in length. The court sets forth sections 49.006, 49.007 and 49.008 to illustrate some of the problems involved and those to whom confidentiality is extended.

Sect. 49.006. REGISTRATION ELIGIBILITY: (a) An adoptee may apply to a registry for information about his birth parents.
(b) A birth parent who is 21 years old or older may apply to a registry for information about an adoptee who is a child by birth of the birth parent.
(c) A putative father who acknowledges paternity but is not, at the time of application, a birth father may register as a birth father but may not otherwise be recognized as a birth father for the purposes of this chapter unless:
(1) the adoptee's birth mother in her application identifies him as the adoptee's biological father; and
(2) additional information concerning the adoptee obtained from other sources is not inconsistent with his claim of paternity.
(d) A biological sibling who is 21 years old or older may apply to the central registry for information about his biological siblings. The application must be independent of any application submitted by a biological sibling as an adoptee for information about his birth parents.
(e) Only birth parents, adoptees, and biological siblings may apply for information through a registry.
(f) No person, including an authorized agency, may apply for information through a registry as an agent, attorney, or representative of an adoptee, birth parent, or biological sibling.
Sect. 49.007. REGISTRATION APPLICATIONS. (a) The administrator shall require each registration applicant to sign a written, verified application.
(b) An adoptee adopted through an authorized agency must register through the registry maintained by that agency or the registry to which the agency has delegated registry services. An adoptee adopted through an authorized agency may not register through any other registry unless the agency through which he was adopted or the successor of the agency does not maintain a registry, directly or by delegation to another agency, in which case the adoptee may register through the registry maintained by the department.
(c) Birth parents may register through one or more registries.
(d) Biological siblings registering as biological siblings may register through the central registry only.
(e) Each application must contain:
(1) the name, address, and telephone number of the applicant;
(2) all other names and aliases by which the applicant has been known;
(3) the applicant's name, age, date of birth, and place of birth;
(4) the original name of the adoptee, if known;
(5) the adoptive name of the adoptee, if known;
(6) a statement that the applicant is willing to allow his identity to be disclosed to those registrants eligible to learn his identity;
(7) the name, address, and telephone number of the agency or other entity, organization, or person placing the adoptee for adoption, if known; or if not known, a statement that the applicant does not know that information;
(8) an authorization to the administrator and his delegates to inspect all vital statistics records, court records, and agency records, including confidential records, relating to the birth, adoption, marriage, and divorce of the applicant or to the birth and death of any child or sibling by birth or adoption of the applicant;
(9) the specific address to which the applicant wishes notice of a successful match to be mailed;
(10) a statement that the applicant either does or does not consent to disclosure of identifying information about himself after the applicant's death;
(11) a statement that the registration is to be effective for 99 years or for a stated shorter period selected by the applicant; and
(12) a statement that the adoptee applicant either does or does not desire to be informed that registry records indicate that the applicant has a biological sibling who has registered under this chapter.
(f) The application may contain the applicant's social security number if the applicant, after being advised of his right not to supply such number, voluntarily furnishes it.
(g) The application of an adoptee must include the names and birth dates of all children younger than 21 years old in the applicant's adoptive family.
(h) The application of a birth mother must include the following information:
(1) the original name and date of birth or approximate date of birth of each adoptee with respect to whom she is registering;
(2) each name known or thought by the applicant to have been used by the adoptee's birth father;
(3) the last known address of the adoptee's birth father; and
(4) other information available to her through which
(i) The application of the birth father must include the following information:
(1) The original name and date of birth or approximate date of birth of each adoptee with respect to whom he is registering;
(2) each name, including the maiden name, known or thought by the applicant to have been used by the adoptee's birth mother;
(3) the last known address of the adoptee's birth mother; and
(4) other information available to him through which the birth mother may be identified.
(j) The application of a biological sibling must include:
(1) a statement explaining the applicant's basis for believing that he has one or more biological siblings;
(2) the names of all the applicant's siblings by birth and adoption and their dates and places of birth, if known;
(3) the names of his legal parents;
(4) the names of his birth parents, if known, and
(5) any other information known to the applicant through which the existence and identity of the applicant's biological siblings can be confirmed.
(k) An application may also contain additional information through which the applicant's identity and eligibility to register may be ascertained.
(1) The administrator shall assist the applicant in filling out the application if the applicant is unable to complete the application without assistance, but the administrator may not furnish the applicant with any substantive information necessary to complete the application.
Sec. 49:008. PROOF OF IDENTITY. The department's rules and minimum standards must provide for proof of identity in order to facilitate the purposes of this chapter and to protect the privacy rights of adoptees, adoptive parents, birth parents, biological siblings, and their families.
[2] 9:3-31. Record or proceedings; change of birth record

A. All records of proceedings relating to adoption, including the complaint, the judgment and all petitions, affidavits, testimony, reports, briefs, orders and other documents filed in such proceedings, shall be filed under seal by the clerk of the court and shall at no time be open to inspection, unless the court, upon good cause shown, shall otherwise order. An index of all adoption proceedings shall be maintained by the clerk of the court, but no index of adoption proceedings shall be open to inspection or be given out for publication except upon order of the court.
B. Upon application of the adopting parent, the clerk of the court shall certify to the State Bureau of Vital Statistics the date of entry of the judgment; the names of the natural parent or parents of the child, if the same appear in the record of the proceedings; the names of the adopting parent or parents; the prior name of the child; the date and place of birth of the child; and the new name of the child as changed by the judgment of adoption.
[3] When a new certificate of birth is made the State Registrar shall cause to be substituted such new certificate for the certificate of birth then on file, if any, and shall notify the local registrar of vital statistics of the place in which the birth occurred who shall enter the new certificate in his local record and place his copy of the original record under seal.

The State Registrar shall cause to be placed under seal the original certificate of birth and all papers pertaining to the new certificate of birth. Such seal shall not be broken except by order of a court of competent jurisdiction. Thereafter whenever a certificate of birth of such person is issued, it shall be made from the new certificate of birth except when an order of a court of competent jurisdiction shall require the issuance of a copy of the original certificate of birth.
[4] Humphers v. First Interstate Bank of Oregon, Pers. Repr. of Estate Harry E. Mackey, M.D., 298 Or. 706, 696 P.2d 527 (Or. 1985) (Complaint by natural mother against doctor who delivered child placed for adoption stated cause of action where doctor gave letter to adopted child to get information about identity of natural mother from hospital on false statement which information adoption laws required to be kept confidential.); In the Matter of Estate of Walker, 64 N.Y.2d 354, 486 N.Y.S.2d 899, 476 N.E.2d 298 (N.Y. 1985) (Adopted children of deceased adoptive parents not entitled to receive decrees of adoption in foreign state as part of devise of all personal property on ground that it would violate public policy of confidentiality reflected in adoption laws of New York.)
[5] TEX.HUM.RES.Code Ann. 49.007-009 (Vernon 1984), Oregon ORS 109.425 to 109.500; New York Domestic Relations Law § 114, Social Services Law § 373-a, Public Health Law § 4138-b and L. 1985, c. 37 further amending Public Health Law to provide that the Department of Health shall not have access to the records pertaining to adoption but shall inform those who have custody if matching consents have been received.