397 A.2d 511.

In re Christine.

FEBRUARY 5, 1981.

Present: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. Children's Friend and Service is a non-profit Rhode Island corporation whose many community services include acting as an agency whereby children committed to its care and custody can be placed with and ultimately adopted by suitable individuals. At the instigation and request of Children's Friend and Service, we have issued our common-law writ of certiorari so that we may review an order of the Family Court which authorizes a guardian ad litem to examine certain adoption records for the purpose of determining the names and last known address of a married couple who had employed Children's Friend and Service some 10 years ago in adopting Christine's daughter. The order permits the guardian to contact the adoptive parents and determine if they have any objections to Christine's contacting the child.[1] Hereinafter we shall refer to Children's Friend and Service as "the agency."

The record indicates that during the final weeks of her pregnancy Christine, single and a minor at that time, met with representatives of the agency to discuss placement of the child for adoption. Shortly after the child's birth, both Christine and her father gave their written consent to any forthcoming adoption. Christine has not seen her daughter since Christine left the maternity ward a little more than 11 years ago. However, she has corresponded with the agency on numerous occasions, seeking information about

---

[1]The trial justice made clear that if the guardian obtained a negative response, Christine's petition would be denied.

the child's welfare and asking that she be given an opportunity to visit the child. The trial justice *sua sponte* treated her communications as a petition for release of the names and address of the adoptive parents.

At a January 25, 1978, hearing in the Family Court, Christine was the only witness. She made clear that she was in no way seeking to void the adoption. Rather, she sought the permission of the adoptive parents to see and, if possible, visit the child. The trial justice recognized that by law, adoption proceedings are confidential. However, he alluded to the tremendous compelling desire of any parent to know the whereabouts of his or her child. Accordingly, he considered his order as a proper balancing of the respective interests of the three real parties to an adoption proceeding; namely, the natural mother, the adoptive parents, and the child. We have issued a stay of the Family Court's order pending a determination of the agency's petition.

In this jurisdiction, because of the relevant portions of G.L. 1956 (1969 Reenactment) §§8-10-21 and 14-1-5, the records of an adoption proceeding shall "not be available for public inspection unless the court shall otherwise order." Thus, in this proceeding the issue to be resolved is whether or not a natural mother's desire to contact her child's adoptive parents with the hope of seeing the child constitutes "good cause" for the lifting of the confidentiality curtain which envelops a Family Court adoption proceeding. We do not believe it does. Our conclusion comes after a considered and deliberate examination of the purposes of the adoption process as they manifest themselves in the pertinent statutes.

At common law adoption was unknown. *Union Trust Co.* v. *Campi*, 51 R.I. 76, 81, 151 A. 131, 133 (1930). Adoption and its legal consequences are purely statutory in origin, and this court has spoken of the number of changes brought about by the adoption process established by our Legislature, changes which, we have said, affect "the entire fabric of our society." *In re Adoption of Minor Child*, 109 R.I. 443, 449-50, 287 A.2d 115, 118 (1972). Among such changes are

the removal of the stain of illegitimacy, because the child now bears the adoptive parents' surname, and the formation of a new family unit, with the consequence that the child is now deemed to be the heir of the his or her new parents. Furthermore, the adoptors, having demonstrated an ability to care for their charge, have voluntarily assumed a duty to support that can carry with it a price tag running into the thousands of dollars. The natural parents can now abide with their decision and hopefully make a proper social adjustment.

Obviously, the legislative purpose is to create a stable environment in which the child can grow and develop into a healthy and productive member of society. We believe that the preservation of the statutory shield of confidentiality not only assists in the realization of this goal but also benefits all of the parties to the adoption triangle. Secrecy enables the natural parent to place the child for adoption with a respectable agency with the assurance that his or her identity will not become public knowledge. The natural parent is then afforded an opportunity to restructure his or her life after a most traumatic episode. The confidentiality proviso allows adoptive parents, having taken a child into their home, to raise that child free from interference from the natural parents and without any apprehension that the birth status of their child will be used to harm themselves or the child. Last, but not least, is the adoptee's interest. The confidentiality shield protects the adoptee from any possible stain of illegitimacy and permits the formation of a relationship with the new parents that hopefully can "bloom and grow forever," free of the threat of outside interference that can be posed by the appearance of a natural, well-intended parent who just wishes to drop by and see or talk to his or her offspring. *See Mills* v. *Atlantic City Department of Vital Statistics*, 148 N.J. Super. 302, 372 A.2d 646 (1977); *Application of Maples*, 563 S.W.2d 760 (Mo. 1978).

We are well aware of the current vogue whereby many individuals, in their desire to search out their roots, gather a

mass of genealogical information. Many root seachers are adult adoptees who, because of their concern for identity and self-image, have resorted to litigation as they seek to open court files regarding their adoption. However, here we are contronted with a court-authorized intrusion upon a family relationship which the state has created and which, we believe, since it involves an 11-year-old child, has yet to grow to maturity.

Bearing in mind the principles to which we have just alluded, we believe that a natural parent who hopes to lift the cloak of confidentiality, even just a bit, bears a heavy burden in establishing the requisite "good cause." In seeking to evaluate Christine's "good cause," we look at the transcript of her testimony, which was taken when she appeared before the Family Court. She spoke of her love for her daughter and expressed a desire to

> "see what type of child she's turned out to be and what she looks like and what her voice sounds like and what, you know, how she acts and things like this and what type of a relationship she has in the home. I'd like to see her relationship with the people, how she interacts. I'd like her to know me as her mother; but, also, I'd like her to realize that her adoptive mother is also her mother. She has two mothers no matter how you look at it."

The sentiments expressed by Christine are, we are sure, shared by many natural mothers who have relinquished a child for adoption.[2] To equate Christine's desires with good

---

[2] "It is generally assumed that a biological parent who relinquishes a child for adoption wants to forget the entire experience and start a new life. Research indicates, however, that this is often not true. Many biological mothers, for example, periodically inquire about their children's welfare at the agencies that handled the adoption. In a recent study of the effect of sealed-record adoptions, many biological mothers expressed a desire to share with their children current information about themselves and to receive reports concerning their children's welfare." Note, *Sealed Records in Adoptions: The Need for Legislative Reform,* 21 Cath. Law 211, 226 (1975).

cause will unquestionably precipitate an influx of petitions filed by natural mothers desirous of seeing children who are becoming integrated within other family units. Granting access to sealed records to individuals such as Christine, in this case the guardian, is completely at odds with the legislative directive which states that, upon entry of an adoption decree, the natural parents "shall be deprived * * * of all legal rights respecting the child * * *." Section 15-7-17. Furthermore, the peek given the guardian impinges upon the legislative promise that who adopts and where they live shall remain confidential. The peek permitted by the court's order casts a cloud of uncertainty upon the minds of all adoptive parents who now realize that some day a court attache may be at their doorstep acting as a courier for a parent whose right to visit with or talk to the adoptive couple's child was supposedly terminated.

A viable system of adoption must be retained, and potential disruption of the adoptive family unit must be avoided at all costs. While we commend Christine's love for her child and are sympathetic to her desire to know the whereabouts of the child, public policy demands that more be demonstrated before the statutory seal on the adoption records can be removed.

The petition for certiorari is granted, the order of the Family Court is quashed, and the papers in the case certified to us are remitted to the Family Court with our decision endorsed thereon.

*James J. Mullen, Lavine, Sutherland and DiGianfilippo, Ltd., Omer A. Sutherland, Joseph DiGianfilippo,* for The Diocesan Bureau of Social Services, Inc., for petitioner.

*William E. Brady,* Rhode Island Legal Services, Inc., for respondent.