705 A.2d 822

IN RE: ADOPTION OF BABY S.

Superior Court of New Jersey
Chancery Division Family Part
Camden County

Decided October 30, 1997.

*Jane Doe*, Petitioner *(pro se)*.[1]

COOK, J.S.C.

Should the records of an adoption proceeding that took place over fifty-five years ago be unsealed to permit the biological mother to inspect and copy them, and thereby obtain identifying information about the adoptee and his adoptive family? Previous reported decisions in this State all have involved requests by adoptees to unseal. *See e.g., Matter of Adoption of Mellinger*, 288 *N.J.Super.* 191, 672 *A.*2d 197 (App.Div.1996) (request by adult adoptee of native American descent for disclosure of the names of her natural parents); *Backes v. Catholic Family and Community Services*, 210 *N.J.Super.* 186, 509 *A.*2d 283 (Ch.Div.1985); (adult adoptee's request for disclosure of biological parents' identity); *Mills v. Atlantic City Dept. of Vital Statistics*, 148 *N.J.Super.* 302, 372 *A.*2d 646 (Ch.Div.1977) (challenge by adult adoptees to constitutionality of statute requiring state registrar to place under seal original birth certificate of any child who is adopted). Thus, the issue raised in this case by the biological mother's request to unseal is one of first impression in New Jersey.

---

[1] The name of the petitioner, the biological mother of Baby S., is fictitious, in order to protect her privacy and that of Baby S., and to prevent disclosure of information from records of adoption proceedings and birth records that have been filed under seal in accordance with *N.J.S.A.* 9:3–52 and *N.J.S.A.* 26:8–40.1.

The background is as follows: In 1940, the biological mother consented to the adoption of Baby S. She is now seventy-five. The adoptee would be fifty-six, if he is still alive. She now wants to identify and locate the adoptee, speak to him, tell him she is his biological mother, and perhaps leave her estate to him in her will. There is no record of any similar request ever being made by the adoptee. A fair inference can be drawn that he does not know he was adopted, or if he does, that he does not wish to know the identity of his birth parents or have contact with them.

Noble and well-intentioned as the biological mother's request may be, the answer is governed by the statute that mandates the sealing of adoption proceeding records, *N.J.S.A.* 9:3–52, as well as the case law interpreting that statute or similar statutes in other jurisdictions. *N.J.S.A.* 9:3–52 provides:

Records of proceedings; filing under seal; inspection; change of birth record

a. All records of proceedings relating to adoption, including the complaint, judgment and all petitions, affidavits, testimony, reports, briefs, orders and other relevant documents, shall be filed under seal by the clerk of the court and shall at no time be open to inspection or copying unless the court, upon good cause shown, shall otherwise order. An index to all adoption proceedings shall be maintained by the clerk of the court, but no index of adoption proceedings shall be open to inspection or copying or be made public except upon order of the court.

As the statute provides, a court, prior to entering an order directing the clerk of the court to open the records pertaining to adoptions, must find that "good cause" exists to do so. Similarly, before entering an order directing that sealed birth records be opened, a court must likewise find that "good cause" for doing so exists. *N.J.S.A.* 26:8–40.1; *Backes, supra,* 210 *N.J.Super.* at 202–03, 509 *A.2d* 283. It is only upon a showing of good cause by the applicant that disclosure may be permitted. *Mellinger, supra,* 288 *N.J.Super.* at 196, 672 *A.2d* 197; *Backes, supra,* 210 *N.J.Super.* at 202–08, 509 *A.2d* 283 (adoptee failed to establish good cause for disclosure).

The legislative purpose for the sealing of adoption records is to provide adoptees, their adoptive parents and their biological parents with a right to privacy and confidentiality. *Backes, supra,*

210 *N.J.Super.* at 203, 509 *A.*2d 283; *Mills, supra,* 148 *N.J.Super.* at 307–08, 372 *A.*2d 646. While this right to privacy cannot be made absolute, especially with regard to requests by adult adoptees to open adoption records, nonetheless in each instance good cause to do so must appear. As Judge Gruccio said in *Mills,* "[T]he statutory provision *[N.J.S.A.* 9:3–31, now *N.J.S.A.* 9–3–52] vests in the court the power to weigh and balance the competing privacy rights and make a determination based upon the facts and circumstances of each case." *Mills, supra,* 148 *N.J.Super.* at 312, 372 *A.*2d 646; quoted with approval in *Backes,* 210 *N.J.Super.* at 203, 509 *A.*2d 283.

In *Mills,* the court reviewed at length the interests that are involved in placing adoption records under seal. Judge Gruccio noted that the purpose of the Adoption Act is to protect the child placed for adoption, the adopting parents, and the biological parents. Analyzing each of their respective interests, Judge Gruccio first addressed those of the biological or natural parents, and the adoptive parents:

> The natural parents, having determined that it is in their own and the child's best interests, have placed the child up for adoption. For example, this decision may be precipitated by an illegitimate birth status of the child and the inability of the unwed mother or father to care properly for the child. The assurance of secrecy regarding the identity of the natural parents enables them to place the child for adoption with a reputable agency, with the knowledge that their actions and motivations will not become public knowledge. Assured of this privacy by the State, the natural parents are free to move on and attempt to rebuild their lives after what must be a traumatic and emotionally tormenting episode in their lives.

> The adopting parents also have an interest in having the birth records placed under seal. They have taken into their home a child whom they will regard as their own and whom they will love and raise as an integral part of their family unit. It is important to these adopting parents that they may raise this child without fear of interference from the natural parents and without fear that the birth status of the illegitimate child will be revealed or used as a means of harming the child or themselves. The State has an active interest in protecting and nurturing the growing family relationship it has statutorily created.

[148 *N.J.Super.* at 307–08, 372 *A.*2d 646.] Next, and especially significant in [*MILLS*], this case, Judge Gruccio placed special emphasis on the interests of the adoptee, aptly observing that:

> *The child, who is the third and ultimately most important party to the adoption, has no voice in the proceedings.* He or she is not represented as an individual by legal counsel. The child's only protection at the proceedings is the thoroughness of the report of the Division of Youth and Family Services and the perceptiveness of the presiding judge. *The State has an obligation to protect the interests of this voiceless party. In re P.,* [114 *N.J.Super.* 584, 277 *A.2d* 566 (1971)]; *In re B.,* 63 N.J.Super. 98, 164 A.2d 65 (App.Div.1960). Sealing the birth records serves the interests of the child. It protects the child from any possible stigma of illegitimacy which, though fading, may still exist, and insures that the relationship with his or her new parents can develop into a loving and cohesive family unit uninvaded by a natural parent who later wishes to intrude into the relationship. The statute requiring that the records be sealed clearly serves the interest of all three parties in the adoptive triangle: adoptive parents, natural parents and the child.

[*Mills,* 148 *N.J.Super.* at 308, 372 *A.*2d 646 (emphasis added).] Thus, in considering the biological mother's request to unseal adoption records in this case, this court cannot overlook or lightly treat the obligation to protect the best interests of the "voiceless party" to the adoption proceedings, Baby S.

The unsealing of adoption records at the request of the biological mother has been addressed in one reported decision elsewhere. *See In re Christine.,* 121 *R.I.* 203, 397 *A.*2d 511 (1979). As here, the biological mother in that case consented to the adoption of her daughter shortly after the child's birth, and years later sought to have the adoption records opened so that she could determine the adoptee's whereabouts, and see and visit the adoptee. Rhode Island statutes, like those of this state, prohibited the unsealing of adoption proceeding records except upon a showing of good cause. The biological mother stated how she loved her daughter and desired to

> see what type of child she's turned out to be and what she looks like and what her voice sounds like and what, you know, how she acts and things like this and what type of a relationship she has in the home. I'd like to see her relationship with the people, how she interacts. I'd like her to know me as her mother; but, also, I'd like her to realize that her adoptive mother is also her mother. She has two mothers no matter how you look at it.

[*In re Christine.,* 397 A.2d at 513.]

The Rhode Island Supreme Court empathized with the biological mother, noting that her sentiments were no doubt "shared by many natural mothers who have relinquished a child for adoption."

*Id.* The court also pointed to research showing that many biological mothers do not want to forget a child relinquished for adoption, and often express a desire to meet with and share information with the children about themselves, and receive reports about the children's welfare. *Id.* 397 *A.*2d at 513, n. 2. Nonetheless, the court found that the biological mother's sentiments and desire to see the adoptee did not equate with the good cause that is necessary to lift the confidentiality curtain which, by statute, envelops adoption proceedings. *Id.* 397 *A.*2d at 512–13. In reaching its conclusion, the Rhode Island Supreme Court embraced Judge Gruccio's scholarly analysis in *Mills,* stating:

> Obviously, the legislative purpose is to create a stable environment in which the child can grow and develop into a healthy and productive member of society. We believe that the preservation of the statutory shield of confidentiality not only assists in the realization of this goal but also benefits all of the parties to the adoption triangle. Secrecy enables the natural parent to place the child for adoption with a respectable agency with the assurance that his or her identity will not become public knowledge. The natural parent is then afforded an opportunity to restructure his or her life after a most traumatic episode. The confidentiality proviso allows adoptive parents, having taken a child into their home, to raise that child free from interference from the natural parents and without any apprehension that the birth status of their child will be used to harm themselves or the child. *Last, but not least, is the adoptee's interest. The confidentiality shield protects the adoptee from any possible stain of illegitimacy and permits the formation of a relationship with the new parents that hopefully can "bloom and grow forever," free of the threat of outside interference that can be posed by the appearance of a natural, well-intended parent who just wishes to drop by and see or talk to his or her offspring.* See Mills v. Atlantic City Department of Vital Statistics, 148 *N.J.Super.* 302, 372 *A.*2d 646 (1977); *Application of Maples,* 563 *S.W.*2d 760 (Mo.1978).

[*In re Christine.,* 397 *A.*2d at 512–13. (emphasis added).]

Proper consideration of the legislative purpose for the statutory requirement that adoption records be sealed, as well as the respective interests of the parties to an adoption which are so definitively set forth in *Mills,* requires the determination in this case that good cause does not exist for the unsealing of the records of the adoption of Baby S. The desire of the petitioner— biological mother to now see the son she surrendered for adoption so long ago, and perhaps leave him with some monetary bequest, does not equate with good cause. Her stated interest cannot be

said to outweigh the preservation of his interests, not the least of which is his relationship with his family and family unit, which presumably has grown through the past fifty-six years. Nor can it even be assumed that he knows he was adopted. There is no record of any request by him to inspect adoption records, or to otherwise identify his biological parents. Nor is there any evidence of a desire on his part to meet or speak with them. Petitioner herself acknowledges the situation in a letter she submitted asking, "Does he know he was adopted?", and "Does he want to find me?"

The confidentiality shield of *N.J.S.A.* 9:3–52 has not only protected Baby S. for fifty-six years, but it has also permitted him to form a relationship with his adoptive parents and in turn with a family of his own, that hopefully has bloomed and grown for over half a century, "free of the torment of outside interference that can be posed" by the sudden and long-belated appearance, after so many years, "of [his] well-intended [biological mother], who just wishes to drop by and see or talk to ... her offspring." *In re Christine., supra.*

While this court empathizes with petitioner's stated desire to now see the son she surrendered for adoption so long ago, good cause to strip away the confidentiality shields of *N.J.S.A.* 9:3–52 and *N.J.S.A.* 26:8–40.1 that have protected him for the past fifty-six years, does not exist. Accordingly, the petition is denied.