**In re PHILIP S. et al.**
**No. 2004–342–Appeal.**
Supreme Court of Rhode Island.
Sept. 19, 2005.

Sean P. Lynch, Randall J. Levesque, for Petitioner.

Linn Foster Freedman, Esq., Providence, for Respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

**PER CURIAM.**

This case, in which the underlying dispute revolves around the petitioner's professed need to have access to the records of his own adoption, involves a clash of rights—each of which deserves respect, even though they cannot be reconciled with each other. The petitioner asserts that his religious convictions are of such a magnitude that the confidentiality that ordinarily attaches to adoption records should be subordinated to his convictions. In our judgment, the petitioner has failed to proffer adequate proof that he is entitled to such a result.

The petitioner was born in 1971. He was later adopted after the services of the Sophia Little Home (a home for "unwed mothers") had been engaged with respect to the arrangement of an adoption. In or about April of 2001, petitioner (who, at least at some times during the pendency of this case, was incarcerated in Pennsylvania) commenced the process of seeking an order from the Rhode Island Family Court so that he could determine the identity of his biological parents.[1] The petitioner based his claim of entitlement to that information upon his own understanding of the teachings of Mormonism. The state resisted, asserting that the birth mother's right to privacy should prevent the re-

---

1. It appears that petitioner is already in possession of nonidentifying information, but he nonetheless is seeking fuller information about his biological parents. *See generally* Sarah E. Nugent, *The Release of Nonidentifying Information to Adopted Children: Striking a Balance Between the Rights of Biological Parents and Adopted Children,* 23 Rutgers L.J. 709 (1992).

quested information from being revealed.[2]

We need not narrate at length the travel of this case through the Family Court. Suffice it to say that, in the end, the Chief Judge of that court ruled, in a thoughtful rescript opinion, that petitioner had not proven his case.

Although this case could potentially plunge us into a lengthy discussion of several tantalizing and significant issues, it is our opinion, upon reviewing the record of the case as litigated, that the Family Court correctly disposed of this matter on the basis of its determination that there was a failure of proof on petitioner's part. The petitioner presented the Family Court with no meaningful evidence to support his petition other than his own subjective assertions about what he considered to be the requirements of his religion.[3]

In Rhode Island, access to the records of an adoption proceeding is permit-ted only pursuant to a court order, and such an order is issued only upon a showing of *good cause*. *In re Christine*, 121 R.I. 203, 207, 397 A.2d 511, 513 (1979). Moreover, we have expressly held that "[t]he one seeking access to the information * * * *bears a heavy burden* in establishing the requisite good cause." *In re Assalone*, 512 A.2d 1383, 1385 (R.I.1986) (internal quotation marks omitted) (emphasis added).[4]

The reason why the good cause requirement is so exigent in this context is that the confidentiality of the adoption process is deemed to be of an extraordinarily high value.[5] In his opinion for the Court in the case of *In re Christine*, 121 R.I. at 206, 397 A.2d at 512–13, Justice Kelleher summarized the benefits that "the statutory shield of confidentiality" brings to each of the parties to the adoption triangle.[6] With

---

**2.** There is no indication in the record that the birth mother has ever availed herself of the provisions of Rhode Island's Passive Voluntary Adoption Mutual Consent Registry Act. G.L.1956 chapter 7.2 of title 15.

**3.** The petitioner did submit to the Family Court certain religious scriptures or texts that he asserted were supportive of his interpretation of Mormonism, but he provided the Family Court with no expert testimony concerning those documents.

**4.** In the case of *In re Assalone*, 512 A.2d 1383 (R.I.1986), we specifically emphasized that, before intermediary steps (such as providing the biological parents an opportunity to be heard) need be taken, the person petitioning for access to his or her adoption records must first bear "the initial burden of establishing good cause or compelling need * * *." *Id.* at 1390.

**5.** In *Application of Maples*, 563 S.W.2d 760, 764 (Mo.1978) (en banc) (a case that we cited favorably in *In re Christine*, 121 R.I. 203, 397 A.2d 511 (1979) and again in *In re Assalone*, 512 A.2d 1383 (R.I.1986)), the Supreme Court of Missouri quoted extensively from a thoughtful article that had appeared in the Family Law Quarterly. We are particularly struck by the following two paragraphs from that article (whose validity we do not believe to have faded with age):

> "No one has yet shown that decades of policy protecting the anonymity of the biological parents and the security from intrusion of the parent-child relationship after adoption have been misguided." Quite the contrary. The overwhelming success of adoption as an institution which has provided millions of children with families, and vice versa, cannot be easily attacked.
>
> "The public has a strong interest * * * in preserving the confidential non-public nature of the process. Public attitudes toward illegitimacy and parents who neglect or abuse children have not changed sufficiently to warrant careless disclosure of the circumstances leading to adoption." Elton B. Klibanoff, *Genealogical Information in Adoption: The Adoptee's Quest and the Law*, 11 Family L.Q. 185, 196 (1977).

**6.** We understand "the adoption triangle" to be made up of the natural parents, the adopted child, and the adoptive parents. It should go without saying that, in addition, the state has a very real interest in the success of

respect to the benefits that the statutory assurance of confidentiality brings to those who choose to give a child up for adoption, Justice Kelleher spoke as follows in *In re Christine*, 121 R.I. at 206, 397 A.2d at 513: "Secrecy enables the natural parent to place the child for adoption with a respectable agency with the assurance that his or her identity will not become public knowledge." *See In re Adoption of Baby S.*, 308 N.J.Super. 207, 705 A.2d 822, 823–26 (1997) (discussing at length this Court's opinion in *In re Christine* ); *see also In the Matter of Roger B.*, 85 Ill.App.3d 1064, 41 Ill.Dec. 386, 407 N.E.2d 884, 886–87 (1980); *Bradey v. Children's Bureau of South Carolina*, 275 S.C. 622, 274 S.E.2d 418, 421–22 (1981).

We continue to adhere to the philosophy that this Court endorsed in the case of *In re Christine*, according to which confidentiality is deemed to be a value of a high order in the adoption context. The subject

of adoption and the expectations of confidentiality that so often surround it are inherently complex and delicate. We give the benefit of the doubt to the preservation of confidentiality in close cases. There is much wisdom in the venerable opinion of the English Court of Chancery in *Pearse v. Pearse*, 1 DeG. & Sm. 12, 28–29, 63 Eng. Rep. 950, 957 (Ch. 1846): "Truth, like all other good things, may be loved unwisely—may be pursued too keenly—may cost too much."

It is our opinion that a petitioner who seeks to bear the heavy burden of establishing "good cause" must submit objective evidence in support of the petition—usually in the form of professional opinions that support the petitioner's case.[7] Otherwise, the very important personal and societal interests that the adoption process serves might well be exposed to abuse on the basis of utterly subjective assertions.[8]

---

the adoption process. *See In re Assalone*, 512 A.2d 1383 (R.I.1986).

**7.** It is noteworthy that many decided cases assume *sub silentio* that a petitioner who cites grounds such as psychological need will present objective evidence in the form of expert testimony to support his or her petition. *Compare, e.g., Application of Hayden*, 106 Misc.2d 849, 435 N.Y.S.2d 541, 543 (N.Y.Sup. Ct.1981) (noting that the petitioner in that case had submitted, inter alia, a letter from her personal physician and the report of her personal psychologist in support of her petition) *and Application of Anonymous*, 92 Misc.2d 224, 399 N.Y.S.2d 857, 859 (N.Y.Sur. Ct.1977) (expressly taking note of "the expert testimony of petitioner's own psychologist"), *with Application of Maples*, 563 S.W.2d at 766 (noting that the record showed "little more than a thinly supported claim of a 'psychological need to know' ") *and Application of Romano*, 109 Misc.2d 99, 438 N.Y.S.2d 967, 971 (N.Y.Sur.Ct.1981) ("[I]t is to be noted that the instant petition contains no affidavit by, for example, any person trained in any of the mental health disciplines attesting to the validity of the movant's claim of psychological

need, nor is there any indication that such proof may be forthcoming.").

**8.** It is important to note that, even when petitioners advance quite plausible and well-supported claims, courts in a wide variety of jurisdictions have tended to be reluctant to grant access to identifying information in adoption records. *See, e.g., In the Matter of the Adoption of S.J.D.*, 641 N.W.2d 794 (Iowa 2002); *Dixon v. Department of Public Health*, 116 Mich.App. 763, 323 N.W.2d 549 (1982); *Application of Maples*, 563 S.W.2d at 760; *Matter of Linda F.M. v. Department of Health of New York*, 52 N.Y.2d 236, 437 N.Y.S.2d 283, 418 N.E.2d 1302 (1981).

Speaking in general terms, it is our view that only a truly extraordinary claim can constitute good cause sufficient to trump the confidentiality and privacy rights of the other parties to the adoption triangle. While we are not without sympathy for those who seek to learn about their "roots," we must not allow the good cause requirement to become a nullity. *See Linda F.M.*, 437 N.Y.S.2d 283, 418 N.E.2d at 1304 ("A desire to learn about one's ancestry should not be belittled. When

Although we set forth in footnote nine some of our preliminary thoughts about the subject, we need not rule definitively in this case on the relationship between religious convictions and the "good cause" requirement—because the Family Court had before it nothing more than petitioner's *ipse dixit* as to his subjective interpretation of his religion.[9] Putting aside for a moment the constitutionally based reservations that we have briefly summarized in footnote nine, it is our opin-

ion that petitioner utterly failed to present adequate evidence to support his petition, even on his own chosen grounds.

In short, the petitioner in this case fell far short of sustaining his burden of proving the existence of good cause. We can apply to this case the words that we used in our opinion in *In re Assalone,* 512 A.2d at 1390: "In the instant case the initial burden of establishing good cause or compelling need has not been sustained."

balanced against the interests of other parties to the adoption process, however, it cannot alone constitute good cause under [the pertinent statute].").

9. As for the grounds that the petitioner in the instant case cited as constituting good cause (viz., his subjective interpretation of the requirements of Mormonism), we note that the Supreme Court of Missouri in *Application of Gilbert,* 563 S.W.2d 768, 770 (Mo.1978) (en banc), sounded the following cautionary note as it afforded the parties to that case an opportunity to offer evidence concerning the fundamental beliefs of the Mormon Church:

"[I]n receiving such evidence, the court must be mindful that evidence of one's religious beliefs may not require opening the [adoption] record if it results in preferential treatment for one professing such belief, because the granting of privilege to one religious denomination not enjoyed equally by others could in itself be constitutionally suspect."

We are in substantial agreement with the Missouri court in *Gilbert* with respect to the "constitutionally suspect" nature of government action that "results in preferential treatment" for a particular religion or religious belief.

The First Amendment to the United States Constitution and the cases interpreting it have historically been protective of the individual conscience in religious matters. *See, e.g., Michaelson ex rel. Lewis v. Booth,* 437 F.Supp. 439 (D.R.I.1977); *see also Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Similar protection is available in appropriate circumstances under article 1, section 3, of the Rhode Island Constitution. But the protections afforded by the religion clauses of both constitutions are not unlimited.

*See, e.g., Otten v. Baltimore & Ohio R. Co.,* 205 F.2d 58, 61 (2d Cir.1953) (Learned Hand, J.) ("The First Amendment * * * gives no one the right to insist that in the pursuit of their own interests others must conform their conduct to his own religious necessities."); *In re Palmer,* 120 R.I. 250, 254, 386 A.2d 1112, 1114 (1978) ("[W]hile the freedom to hold religious beliefs and opinions is absolute, the freedom to act in harmony with these religious beliefs and opinions is not beyond state regulation where such restriction serves the public interest by promoting public health and safety or preserving order.").

According special advantages of great significance to a petitioner on religious grounds, in derogation of the confidentiality rights that are inherent in the adoption triangle, would be highly problematic from an equal protection perspective. While we make no definitive holding at this time, it is our tentative view that, unless a petitioner's religious beliefs can be "translated" into a more secular context (such as being a constituent element of a particular petitioner's psychological need), we do not see how deferring to such a belief would be anything other than a preferential treatment by government based upon religion; and such preferential treatment would be fraught with constitutional peril. *See e.g., Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 709, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (finding unconstitutional a state statute that provided "Sabbath observers with an absolute and unqualified right not to work on whatever day they designate as their Sabbath."); *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 127, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982) (finding unconstitutional a state statute that granted religious bodies a veto power over liquor license applications).

### Conclusion

For these reasons, the judgment of the Family Court is affirmed. The record may be returned to that court.

Justice SUTTELL did not participate.