# IN THE MATTER OF THE ADOPTION OF INFANT SHERMAN

SX-70-AD-13

Superior Court of the Virgin Islands

Division of St. Croix

February 6, 2007

■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■

H.A. CURT OTTO, ESQ., St. Croix, U.S. Virgin Islands, *Counsel for Petitioner*.

STEELE, *Judge*

## MEMORANDUM OPINION

(February 6, 2007)

### I. INTRODUCTION

THIS MATTER came before the Court on the *ex parte* Motion of Petitioner, L.C.F. to release information pertaining to the adoption of her son.[1] Petitioner asks this Court to find that she presents with good cause, as allowed under 16 V.I. CODE ANN. § 145(c) (1921, amended 1961). For the reasons that follow, Petitioner's request for access to the adoption records of her son [hereinafter "Infant Sherman"] is DENIED.

Petitioner avers that she gave birth to a baby boy, Infant Sherman, in 1969.[2] Unable to keep him at that time, Petitioner placed Infant Sherman up for adoption at birth.[3] Five days after Infant Sherman's birth, Petitioner executed an agreement in which she agreed, in part, to "relinquish all rights to and convey custody of said child." CONSENT FOR ADOPTION FROM NATURAL MOTHER, *In the Matter of the Adoption of Infant Sherman*, No. SX-70-AD-13 (V.I. 1970). In 1970 a Decree was issued by the Municipal Court of the Virgin Islands, Division of St. Croix, Christiansted Jurisdiction, whereby the name of Infant Sherman was changed and his adoptive parents were awarded legal custody and charged with all the rights and responsibilities of natural parents. ORDER AND DECREE, *In the Matter of the Adoption of Infant Sherman*, No. SX-70-AD-13 (V.I. 1970). Petitioner appears now and prays for this Court to unseal the record and grant her access to information necessary to

---

[1] Petitioner's *ex parte* Motion is appropriate as she must necessarily petition this Court to unseal the records pursuant to 16 V.I. CODE ANN. § 145.

[2] The Court has redacted the specific names, dates and locations of the events on record so as to protect the integrity of the adoption process and the competing interests of the parties.

[3] Petitioner's affidavit states that her husband at the time was unwilling to keep the child.

locating Infant Sherman. Petitioner, now in her 60's, states that she wishes to obtain Infant Sherman's adoptive identity and location so that she might "bequeath her estate to her son," as well as meet with her only child. *EX PARTE* MOTION FOR ADOPTION INFORMATION at ¶ 7, *In the Matter of the Adoption of Infant Sherman*, No. SX-70-AD-13 (V.I. 2006).

## II. DISCUSSION

This Court has subject matter jurisdiction pursuant to 4 V.I. CODE ANN. § 76 (2004). The facts presented constitute a matter of first impression for this Court. Petitioner presents an emotionally compelling case. In rendering judgment the Court doubts neither the sincerity of Petitioner's request, nor does it seek to punish her for the choices she has already made. Rather, the Court applauds Petitioner for consistently making decisions that put the interests of her child before her own. Without diminishing this, the Court remains obligated to render an impartial judgment under the weight of law, balancing the equities of all parties involved.

Title 16 V.I. CODE ANN. § 145(c) provides that:

> The original birth record of the adopted child, and all records or files in the custody of any governmental agency or of the court relating to any proceedings under this chapter shall be sealed and thereafter shall not be open to inspection by any person other than the adopted person (if he has attained majority and is not incompetent), *except upon the order of the court for good cause shown.* Added June 12, 1961, No. 735, Sess. L. 1961, p. 84. (Emphasis Supplied)

The Legislative History of the Amendment adding subsection (c) to 16 V.I. CODE ANN. § 145 provides no additional information as to the meaning of the terms used or the intended purpose of this particular provision. As Petitioner correctly notes in her Motion, § 145(c) grants the possibility of access to sealed adoption records to two groups of persons: (1) adopted persons who are both emancipated and competent; and (2) other persons who show "good cause." *See* Title 16 V.I. CODE ANN. § 145(c). To afford Petitioner access to Infant Sherman's adoption records she must first demonstrate that she belongs to one of the two categories of people proscribed by the statute. Being that she is not the

223

adoptee in this matter, Petitioner's hope for an evaluation on the merits of her request rests upon her eligibility in the second category outlined above.

■ The Virgin Islands is not unique in requiring that "good cause" be shown before the disclosure of adoption records. *See, e.g.*: [Alaska] A.S. 25.23.150; [Florida] FLA. STAT. § 63.162; [Michigan] M.C.L.A. § 710.67; [New Jersey] N.J.S.A § 9:3-52; [New York] N.Y. DOM. REL. § 114; [Oklahoma] 10 OKL. ST. ANN. § 7505-1.1; [West Virginia] W.VA. CODE § 48-22-702. Like most other "good cause" jurisdictions, the Virgin Islands neither enumerates nor restricts, explicitly, those persons or relations that may make a showing of "good cause." *See id., see contra, e.g.*: [Arkansas] A.C.A § 9-9-506 (only adoptee, birth parent and adoptive parent may get access, upon finding of good cause). Thus, absent further legislative directive, the language of the statute must be construed as intending to impart access to adoption records upon all persons who present with "good cause." *See* 1 V.I. Op. A.G. 119 (statutory words should be given ordinary meaning and interpretation *that is reasonable and harmonious with the rest of the statute, absent definitions*).

Having established that Petitioner is not prohibited from showing "good cause," it becomes incumbent upon this Court to determine the process by which Petitioner's request will be evaluated. Although Courts have defined them differently, there is significant similarity between jurisdictions as to which factors are relevant to a finding of "good cause" for the purpose of unsealing adoption records. *See In re Roger B.*, 84 Ill. 2d 323, 418 N.E.2d 751, 49 Ill. Dec. 731 (1981); *Matter of Dixon*, 116 Mich. App. 763, 323 N.W.2d 549 (1982); *Application of Maples*, 563 S.W.2d 760, 763 (Mo. 1978) ("[t]he primary concern of the state must be to protect and foster an effective scheme for adoption, thus serving the best interest of the child."); *In re Application of George*, 625 S.W.2d 151, 156 (Mo. Ct. App. 1981); *In re Adoption of Baby S.*, 308 N.J. Super. 207, 705 A.2d 822 (1997); *Backes v. Catholic Family & Cmty. Servs.*, 210 N.J. Super. 186, 509 A.2d 283 (1985); *Mills v. Atlantic City Dep't of Vital Statistics*, 148 N.J. Super. 302, 308, 372 A.2d 646 (1977) (holding that the Court must necessarily weigh the interests of the natural parents, the adopting parents and most importantly, the adoptee); *In the Matter of Robert W.S.*, 147 Misc. 2d 569, 558 N.Y.S.2d 473 (N.Y. Fam. Ct. 1990); *In re Philip S.*, 881 A.2d 931 (R.I. 2005); *In re Christine*, 121 R.I. 203,

397 A.2d 511 (1979) (public policy demands protection of the adoptive family unit and the preservation of the adoption system); *Bradey v. Children's Bureau of South Carolina*, 275 S.C. 622, 274 S.E.2d 418 (1981) (holding that the adoptee, biological parent and adoptive process must all be considered).

 Having carefully studied the existing case law on the matter at bar, this Court now holds that a finding of "good cause," for the purposes of 16 V.I. CODE ANN. § 145(c) results *primarily* from the balancing of four factors: (1) the actual or potential interests of the adoptee; (2) the actual or potential interests of the adoptive parent(s); (3) the actual or potential interests of the biological parent(s); and (4) the impact the request would have on the overall purpose, integrity and viability of the adoption system. Where the party is a participant in the proceeding the Court shall consider the *actual* interests represented. Likewise, where the party is absent from the proceeding, the Court will contemplate the *potential* interests of the party and assess the relative risks posed to those interests in considering the request.

Recognizing that, as here, requests for access to adoption records can involve unique and fact-specific circumstances to which this Court has no foresight, it reserves the right to make *secondary* considerations beyond the four *primary* factors outlined above, should it find that additional matters merit consideration.

## III. ANALYSIS

### A. The Actual or Potential Interests of Infant Sherman

The most important of all the interests that must be weighed are those of the adoptee, Infant Sherman. As the Superior Court of New Jersey said in *Mills:* "The child, who is the [] most important party to the adoption, has no voice in the proceedings ...The State has an obligation to protect the interests of this voiceless party." 148 N.J. Super. at 308. As the only party who could not consent to the adoption contract, it is this Court's view that the interests of Infant Sherman be given the most consideration. In other words, absent knowledge of his *actual* interests, the Court will consider the worst risks he would *potentially* face if Petitioner's request is granted. To wit, Infant Sherman has never appeared before this Court or any other governmental agency within the Territory to request that the record be unsealed. Thus, while the *actual*

reasons behind Infant Sherman's silence remain unknown, it is imperative that in his absence this Court postulate several possibilities that help identify the *potential* interests at stake.

Let us assume for the sake of discussion that Infant Sherman's adoptive parents have never revealed to him that he is adopted. Assume further that Petitioner's request is granted and she is given access to his identifying information. Imagining this scenario brings to light several risks the Court must take under consideration when balancing the potential interests of Infant Sherman against those of Petitioner and the other parties involved. The most important of these risks is the effect, if any, on his psychological well-being. Infant Sherman will turn 38 years old this year. If his entire life is structured around a loving family that has, for all intents and purposes, treated him as their own, another person entering his life as a parent at this juncture could have disastrous effects. The confusion that may sweep into his life could make him distant or despondent towards his adoptive family. His sense of identity may be compromised and questions may surface that put relationships with his parents and other family members in unwarranted jeopardy. It is doubtful that any amount of money from Petitioner would provide adequate reparation for the personal turmoil endured as a result of such an unexpected and life-shattering revelation.

Alternatively, let us assume now that Infant Sherman's adoptive parents have revealed his adoptive status to him. What then is to be made of his silence? His ability to appear before this Court and request that the record be unsealed has existed for roughly twenty years. *See* Title 16 V.I. CODE ANN. § 145(c). In light of his absence, the Court must contemplate several potential explanations for his silence.

Infant Sherman may have determined that the only real parents he has or desires to know are those he has always known. The desire to keep the record sealed may very well be the result of having carefully calculated that the unknown risks associated with identifying Petitioner outweigh any likely or foreseeable benefit or joy he may reap from such knowledge.

Alternatively, he may be in protracted contemplation or pursuit of the matter. Other matters in his personal life may make the decision to find his birth parent(s) better left for the future. The clear possibility remains, however, that Infant Sherman may *yet* appear and make the request Petitioner has already made. Knowledge of one's adoptive status is not

226

synonymous with an immediate and unequivocal desire to be reunited with the biological parent.

Finally, it may be that Infant Sherman has not appeared because he is currently under some incapacity. Title 16 V.I. CODE ANN. § 145(c) grants access to adoption records to an adoptee who is both emancipated and without incompetence. Infant Sherman may suffer from mental illness or disability. Even worse, he may already be deceased. Excluding death, the *possibility* exists that whatever incapacity is effectively preventing him from contacting this Court on his own volition may lift, allowing him to appear and request that the record be unsealed.

## B. The Actual or Potential Interests of the Adoptive Parent(s)

Adoptive parents present with their own unique set of interests. Prior to a successful adoption, hopeful parents-to-be often endure a process that lasts as long as a year or more, requires thousands of dollars in personal expense and demands commitment of time and energy. When their dreams ripen into realization, adoptive parents experience a joy much like that of a natural parent. The costs they endure quickly change from application requirements to parenting obligations. For many, however, it is a welcome expense. The benefits of parenthood are one of the many common reasons people engage the adoption process in the first place. Some married couples pursue adoption as an alternative to their own reproductive limitations. Others view adoption as a way to help improve the fabric of our society. Regardless of what brings the adoptive parent into the process, each does so with the hope of someday obtaining all the same rights and responsibilities natural to any parent.

As with Infant Sherman, the *actual* interests of his adoptive parents are unknown. Accordingly, the Court evaluates their *potential* interests. Many interests exist, most notably a privacy interest. While the desire for privacy is not exclusive to adoptive parents, it is perhaps the greatest interest they present with. As the *Mills* Court stated:

> The adopting parents also have an interest in having the birth records placed under seal. They have taken into their home a child whom they will regard as their own and whom they will love and raise as an integral part of their family unit. It is important to these adopting parents that they may raise this child without fear of interference from the natural parents ... 148 N.J. Super. at 307-08.

227

Granting Petitioner's request might constitute interference with the lives of the adoptive parents. Her interjection, no matter how benevolent, may have detrimental effects on the integrity of the family unit and the legitimate privacy interests of the adoptive parents. Absent an explicit consent to be contacted in the future, the Court *must* infer that Infant Sherman's adoptive parents wished to carry on their life with their adopted son in privacy, so as to provide him with the best environment in which to grow. The Court therefore gives significant weight to the reasonable expectation of privacy Infant Sherman's parents had at the time they consented to the adoption.

In addition to this, there is a contract interest at stake. Both the adoptive parents and Petitioner are parties to legal, contractual obligations. Petitioner, in waiving her parental rights, knowingly consented to release herself of all obligations concerning the child. As part of the bargained-for nature of the agreement, Infant Sherman's adoptive parents were given exclusive legal custody, including the right to determine how they would raise their son. Inherent in this is the power to decide whether or not they will tell him about his adoption. Mindful that the petition before this Court is not based on any *claim of right* but on a *showing of good cause,* the Court is required to consider the contractual obligations and work to uphold them.

## C. The Actual or Potential Interests of the Biological Parent(s)

Petitioner is the biological mother of Infant Sherman. Unlike the parties discussed above, this Court is aware of Petitioner's *actual* interests as presented in her Motion. The Court will accept only the *actual* interests of a party who is present before the Court. Petitioner clearly states two interests in her present Motion: (1) the desire to name him as a devisee in her Last Will and Testament, bequeathing to him what she claims is a sizable estate, with the hope that it will assist him financially; and (2) the desire to meet with her only child, a child she placed up for adoption some thirty-seven years ago. Petitioner proffers several cases in support of her present Motion.

Petitioner first cites *In re Estate of Hodge* in support of the notion that although deprived of natural inheritance rights, Petitioner is not necessarily restricted from including Infant Sherman in her Will. 24 V.I. 210 (1989). The Court fully agrees with Petitioner in this regard. However, while the right to *devise* property to a biological son is not

228

*prohibited* under any statute in this jurisdiction, the same is not carved out as an exception to 16 V.I. CODE ANN. § 145. Thus, while no law would impede her right to name him as a devisee to her Last Will, the mere absence of a prohibition thereof does not equate to a showing of good cause.

To support her claim that her interest in naming Infant Sherman in her Last Will constitutes good cause, Petitioner cites several decisions made by Louisiana Courts. *See Kirsch v. Parker*, 383 So.2d 384 (La. 1980); *Massey v. Parker*, 369 So. 2d 1310 (La. 1979); *Prentice v. Parker*, 376 So. 2d 568 (La. Ct. App. 1979). In each of these cases, Petitioners were adoptees seeking the identity of their biological parents. *See id.* To the knowledge of this Court, Louisiana is the only state that statutorily preserves inheritance rights under intestacy between biological parents and their children after order of an adoption decree. *See* LSA-C.C. Art. 214. Despite this, the Louisiana Courts found in each of these cases that the *prospective* right to an intestate inheritance did not merit *total* disclosure to the petitioning adoptee. *See Kirsch*, 383 So.2d at 387; *Massey*, 369 So. 2d at 1314-15; *Prentice*, 376 So. 2d at 571. In every case the Court noted the competing interests of the other parties (namely, the biological parents) and decided that the existence of *potential* statutory rights merited the appointment of a curator ad-hoc to investigate whether any *actual* interest existed and report that finding to the Court. *See id.*

The Virgin Islands do not have a statute similar to LSA-C.C. Art. 214. Nowhere in the Virgin Islands Code is it codified that the right to inherit property from a biological parent is a statutory interest which this Court is compelled to protect. The only reason any of the adoption records in the Louisiana cases were unsealed *at all* was because of the intestate succession protection statute. This Court finds notable the fact that despite a statutory *right*, the Louisiana Court took extreme steps to ensure that no parties received any information unless any of the rights protected by the statute were actual, as opposed to mere potential interests.

Petitioner has also cited a Kentucky case which is completely off point. In *Bone v. Shadoan* the Petitioner-Appellant had her parental rights terminated for failure to respond to a Court order in a timely matter. *See* 746 S.W.2d 68 (Ky. 1998). She appealed the proceeding. *See id.* The Court held that the sealing of an adoption record was not

229

intended to apply to an appeal against a judgment of adoption. *See id.* Petitioner was not part of a termination of rights proceeding, nor is she appealing the adoption judgment.

■ Although not supported by any case law, Petitioner's statement of human desire to meet her son is insufficient as good cause. Courts have soundly rejected previous requests based on longing, curiosity or a simple desire to know. *See Roger B.,* 49 Ill. Dec. 731, 418 N.E.2d 751 at 756-57; *Backes,* 509 A.2d at 299; *Christine,* 397 A.2d at 513.

## D. The Impact of Granting Petitioner's Request on the Purpose, Integrity and Viability of the Adoption System

Adoption is a creature of statutory construction. As this Court previously stated in *Estate of Hodge:*

> The right of adoption, while known to the ancients of Greece and Rome, and probably to other ancient people, and while practiced among many of the continental nations under the civil law from the remotest antiquity, was unknown to the common law of England, and exists in this country in those jurisdictions having that law as the basis of their jurisprudence, only by virtue of statute. *See In re Estate of Hodge,* 24 V.I. 210, 213-14 (quoting 1 AM. JUR., § 3; 2 AM. JUR. 2d, § 2; *In re Estate of Wheatley,* 4 V.I. 72, 174 F. Supp. 868 (D.C.V.I. 1959)).

Every jurisdiction has created a statutory scheme in which the conditions and procedures necessary to the process of adoption have been outlined. *See, e.g.:* [California] *In re Taggert,* 190 Cal. 493, 213 P. 504 (1923); [Massachusetts] *Ross v. Ross,* 129 Mass. 243 (1880); [Tennessee] *Helms v. Elliott,* 89 Tenn. 446, 14 S.W. 930 (1890). The statutory scheme of the Virgin Islands is outlined in Chapter 5 of Title 16 of the V.I. Code. *See* Title 16 V.I. CODE ANN. §§ 141-147.

The evident purpose of our adoption laws can be derived from the language of 16 V.I. CODE ANN. § 146 (1921):

> (a) *A child adopted under the provisions of this chapter is deemed, for the purpose of inheritance and all other legal consequences and incidents of the natural relation of parents and children, the child of the parents by adoption, the same as if he had been born to them in lawful wedlock,* except that he is not

capable of taking property expressly limited to heirs of the body or bodies of the parents by adoption, nor property from the lineal or collateral kindred of such parents by right of representation.

(b) *The natural parents of such child are deprived by a decree under section 145 of this title of all legal rights as respect the child,* and the child is freed from all obligations of maintenance and obedience as respect his natural parents. (Emphasis supplied)

The language could not be clearer. The purpose of the adoption process, as further explained in *Estate of Wheatley,* is to "imbue or clothe an adopted child with all the legal consequences and incidents surrounding a natural born child." *See* 174 F. Supp. 868, 4 V.I. 72 at 77.

Considering the purpose of the adoption schema, what risk, if any, is posed to the integrity of the process and consequently, the interests of the Territory, if this Court were to honor Petitioner's request? Clearly, based on the language of § 146, Petitioner will not acquire any legal rights or incidents thereof which would bond her with Infant Sherman. There is no foreseeable threat posed to the status of the legal relationships of the interested parties by unsealing the adoption records. Thus, no argument can be made that the legal rights of the parties will change from the opening of the record.

There is, however, a threat to the future of the adoption system. Allowing Petitioner access may lead many considering adoption services from both sides of the adoption contract to think twice. Adoptive parents would spend their lives looking over their shoulder, always wondering if and when the biological parent will reappear. Some biological parents may not be as benevolent as Petitioner, giving up their child at birth with the knowledge or expectation that when they're ready, they can reenter the child's life—without any obligations of their own. Additional scenarios are conceivable. With fewer protections in place, people weighing the possibility of an adoption may simply decide that the risks are too substantial to justify the costs. The likely result is a larger number of children living outside stable and supportive family environments, contrary to the interests of the Territory.

Consequently, the policy of this Court is to evaluate each and every request for adoption information on a case-by-case basis. The facts of each case are to be reviewed privately by the Court and careful consideration is to be given to all interests. When necessary, the Court

believes it should err in favor of the adopted child's interests. Adhering to this protocol will ultimately ensure that the interests of the Territory and the adoption system therein are sufficiently protected.

## IV. CONCLUSION

Petitioner's desire to see her son after thirty-seven years and perhaps devise something to him under her Last Will does not rise to the level of good cause. Balancing the interests involved, Petitioner cannot tip the scale in her favor. Although the Court does not dispute that knowing his biological mother has the potential for bringing joy into Infant Sherman's life, the life-changing risks that exist substantially outweigh Petitioner's most benevolent intentions. In making this finding, the Court relies heavily upon the fact that Infant Sherman has never appeared here to learn about Petitioner. Whether a product of his parent's planning or his own choosing, Infant Sherman left this Court after adoption and to date has never looked back. It is not the place of this Court to judge the reasons behind the decisions of the parents or the adoptee. Rather, this Court must respect and honor them. Doing so is in the best interest of the child and his family.

■Accordingly, the Court finds that Petitioner's consent to the adoption of Infant Sherman in 1969 terminated any legal rights she had to know the child, including his present identity and whereabouts. Her request for access to his identifying information is not supported by interests that rise to the level of good cause as required by Title 16 V.I. CODE ANN. § 145 and is therefore DENIED.